## Dylan Keene[1] *vs.* Brigham and Women's Hospital, Inc.

Norfolk. January 9, 2003. - April 22, 2003.

Present: Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Medical Malpractice,* Damages, Hospital. *Negligence,* Hospital, Spoliation of evidence. *Charity. Hospital. Practice, Civil,* Discovery, Default, Loss of evidence. *Evidence,* Hospital record. *Constitutional Law,* Alteration of common law rights.

In a malpractice case in which a baby suffered catastrophic harm within hours of his birth at the defendant hospital, the judge properly entered a default judgment on liability as a sanction for the defendant's failure to produce in discovery certain relevant hospital records that it admittedly had lost where, on the unique and extraordinary record presented, the missing records, which the defendant conceded were irreparably lost, contained the only documentation of the critical time period during which the alleged malpractice occurred; and where, because of the defendant's failure to maintain the missing records, as it was required by law to do, the plaintiff's family was prevented from knowing what actions were, or were not, taken when the severity of the plaintiff's medical condition became apparent, or the identities of those responsible for his care at the time. [233-237]

In a malpractice case in which a baby suffered catastrophic harm within hours of his birth at the defendant hospital, the judge lacked authority to strike the $20,000 statutory charitable cap on damages imposed by G. L. c. 231, § 85K, where the plain text of the statute made the cap mandatory and contained no language that would have warranted its abrogation as a sanction for the defendant's failure to produce in discovery certain relevant hospital records that it admittedly had lost; where the statutory cap was raised by the defendant in a timely manner, without a claim of surprise; where it was undisputed that the defendant was a charitable corporation and that it was acting in the performance of its charitable purposes when the harm occurred; and where the cap could not be struck as a sanction when, as here, both parties agreed that the cap was applicable, but the judge had waived the cap, on the ground that it was "unfair." [237-242] Ireland, J., dissented.

Civil action commenced in the Superior Court Department on May 12, 1995.

A pretrial motion for sanctions was heard by *Thomas E. Con-*

---

[1]By his parents and next friends, Kathleen Keene and Robert Keene.

*nolly*, J., and a hearing on assessment of damages was had before *Judith Fabricant*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kenneth W. Salinger* (*Steven L. Schreckinger* with him) for defendant.

*Chris A. Milne* (*Marc G. Perlin* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Colin J. Zick & Anne Sterman* for Massachusetts Hospital Association.

*Carl Valvo* for Professional Liability Foundation, Ltd., & another.

*Ben Robbins* for Associated Industries of Massachusetts.

*Valerie A. Yarashus, J. Michael Conley & Kristen A. Barnes* for Massachusetts Academy of Trial Attorneys.

GREANEY, J. This is a malpractice case in which a baby suffered catastrophic harm within hours of his birth at the defendant hospital. We are asked to decide whether (1) a default judgment on liability was properly entered as a sanction for the defendant's failure to produce in discovery relevant hospital records that it admittedly had lost; (2) damages assessed against the defendant are limited by the $20,000 cap imposed by G. L. c. 231, § 85K, on damages recoverable from a charitable corporation for a tort committed in the course of the performance of its charitable purpose; and (3) general damages may be awarded for loss of enjoyment of life when an injured plaintiff lacks cognitive awareness of that loss. A judge in the Superior Court imposed the sanction of default as to liability on the defendant and, as an additional sanction, struck the statutory $20,000 cap on damages (which the parties agree would have applied). A different judge presided at the hearing on the assessment of damages. She awarded the plaintiff specific and general damages totaling $4,108,311 (plus interest), but she did not award, as an item of general damages, compensation for loss of enjoyment of life. Both parties appealed, and the Appeals Court affirmed the judgment in all respects. See *Keene* v. *Brigham & Women's Hosp., Inc.*, 56 Mass. App. Ct. 10 (2002). We granted the defendant's application for further appellate review and now

conclude that judgment properly was entered against the defendant on liability, but that the damages assessed are limited by the cap set forth in G. L. c. 231, § 85K. In view of the latter conclusion, we need not consider the plaintiff's claim of entitlement to damages for loss of enjoyment of life. Accordingly, we affirm so much of the judgment as imposes liability, vacate the portion of the judgment that assesses damages, and direct that damages be assessed against the defendant in the amount of $20,000 (plus interest and costs).

The known facts relevant to the alleged malpractice are as follows. The plaintiff was born at 1:07 A.M. on May 15, 1986, at the defendant hospital. Within the first five hours of life, he experienced some degree of respiratory distress and was sent from the regular care nursery to the special care nursery (also known as the neonatal intensive care unit or NICU) because he was "cyanotic."[2] At 6:25 A.M., blood tests, including a complete blood count and a blood culture, were performed and, immediately thereafter, the plaintiff was sent back to the regular care nursery with a discharge note stating: "[r]outine care in regular nursery"; "watch for [signs and symptoms] of sepsis"; and "[h]old antibiotics pending CBC results and cultures in 24 [hours], 48 [hours], [and] 72 [hours]." It is not known who received the results of the initial complete blood count (which indicated the presence of Beta-Hemolytic Streptococci Group B) or what actions were, or were not taken, with respect to the plaintiff's condition, because all of the defendant hospital records[3] with respect to his treatment and care between the hours of 6:30 A.M. on May 15, 1986, and 12 A.M. on May 16, 1986,

---

[2] The term "cyanotic" describes a newborn who exhibits a dusky coloring or bluish tinge.

[3] As an initial matter, we reject the defendant's contention that only one record, a portion of a single document described as a "Kardex" file, is missing. It is inconceivable that a newborn experiencing increasingly severe medical difficulties, such as the plaintiff during the missing record period, would generate but a single medical record, and the record in this case, including an affidavit submitted by the plaintiff as well as deposition testimony of the defendant's employees, does not support such an inference. Paradoxically, as the parties point out, the only precise method to determine how many records are missing is to examine the missing records.

(missing records period) have vanished.[4] The plaintiff's medical records immediately following the missing records period indicate that, by 2:30 A.M., he was suffering septic shock and began having seizures. It was not until this time that antibiotics were ordered and administered. Later testing revealed that the plaintiff had contracted neonatal sepsis and meningitis, resulting in the tragic injuries and situation set forth below.[5]

The plaintiff was discharged from the defendant on June 17, 1986. Existing hospital records for the plaintiff's seven-week hospital stay exceed 470 pages. The only records that cannot be located are those pertinent to the missing record period. Neither party has presented any evidence with respect to who is responsible for this loss or whether the records were intentionally destroyed or negligently or accidentally misplaced.[6]

The timing of the loss, however, is somewhat more certain.

---

[4]The exact time of entry of the next medical record is disputed. The judge who imposed the sanction defined the missing record period as from 6:35 A.M. on May 15 until 12:00 A.M. on May 16, 1986. It is of no importance to our decision whether the missing time period is characterized as twenty, eighteen, or 17.5 hours.

[5]The sepsis and meningitis resulted in profound brain damage to the plaintiff. Permanent manifestations of that brain damage, as described by the Superior Court judge who determined the damages award, include mental retardation, with a level of cognitive function at approximately that of a six month old child; spastic quadriplegia, with little or no voluntary control of any part of his body; limited vision, with only some perception of light; painful scoliosis; and chronic seizure disorder, with regular daily seizures. The plaintiff receives nutrition by means of a gastrostomy tube and does not receive any food by mouth. He is incontinent of bowel and bladder and suffers from chronic constipation. He is unable to participate in his own care in any way, and unable to communicate through the use of language in any form. The plaintiff manifests his reactions to sensations and stimuli through facial expressions and vocalizations, including smiling, grimacing, crying, and laughing.

The plaintiff, now sixteen years old, lives at home with his parents and two siblings. The judge who assessed damages found that the plaintiff's parents "have demonstrated an extremely high level of devotion to [their son], and have developed a high level of skill in meeting his needs, including identifying and obtaining optimal medical, therapeutic, and educational services for him."

[6]The record in this case does not support the plaintiff's suggestion that the missing records were deliberately misplaced or destroyed by a hospital employee in 1987 before a copy was given to the plaintiff's family. Neither, however, does the record support the defendant's blithe assertion that the

On May 1, 1987, following a request by the plaintiff's family for the plaintiff's medical records, the defendant filed a notice of a potential claim with its insurer, Risk Management Foundation (RMF).[7] In response, RMF promptly initiated an investigation into the circumstances of the plaintiff's injury while in the care of the defendant. The plaintiff's medical records, which were requested and received by RMF in the course of its investigation, *appear* to have been complete at that time.[8] RMF's investigative report, dated August 12, 1987, identified three physicians responsible for the plaintiff's care and stated that "it is questionable whether or not antibiotics should have been initiated sooner in view of a shift to the left by the complete blood count which would indicate an infection was going on." The report indicated that the plaintiff's mother had received a complete copy of the medical records. It is undisputed, however, that the records received by the plaintiff's family in response to the request that triggered RMF's investigation, did not include the missing records.[9]

On May 12, 1995, the plaintiff, through his parents, commenced this action for medical malpractice, claiming that the

"missing medical record was evidently misplaced shortly after [the plaintiff's] birth in May 1986, and has not been seen since."

[7]No lawsuit on behalf of the plaintiff, however, was commenced at this time.

[8]The dissenting opinion, *post* at 243-244, takes issue with the court's assessment as to the probable timing of the loss of the missing records. We use the emphasized word "appear" to express a cautionary result based on an appellate record that bespeaks a lack of anything that would warrant definitive certainty. The above inference, however, has support in the record, including: the initial formal investigative report of Risk Management Foundation (RMF) (identifying two physicians interviewed in connection with RMF's investigation whose names do not appear elsewhere in the record); the unchallenged finding of the judge who ordered the disclosure of RMF's investigative file, see note 16, *infra*, that "the only existing documents that contain information about the procedures taken after [the plaintiff's] birth, and the medical personnel who were involved, are the documents compiled by RMF"; and various statements made by the defendant hospital during the course of discovery suggesting its belief that RMF possessed information relating to the missing record period. In the larger picture, nothing really turns on the disagreement here discussed because, as will be pointed out, the defendant was properly defaulted and the statutory cap acts to limit its damages.

[9]The judge made no findings with respect to when the missing records became "missing."

defendant had failed properly to diagnose or treat him for the sepsis and meningitis, resulting in serious injury.[10] The defendant asserted, as an affirmative defense, the statutory limitation of damages on a charitable corporation under G. L. c. 231, § 85K.[11] The defendant subsequently provided the plaintiff a set of hospital medical records certified as "a true and complete copy of this hospital's medical record concerning [the plaintiff]."

The parties are not in complete agreement with respect to the events leading to the challenged sanctions. What follows is a summary of the relevant findings of the judge who imposed the sanctions, supplemented, in part, with facts documented in the record, and inferences drawn therefrom. On October 18, 1995, the plaintiff served the defendant with notice pursuant to Mass. R. Civ. P. 30 (b) (6), 365 Mass. 780 (1974), of a deposition. The notice sought the identities of doctors, nurses, and other hospital personnel responsible for the care and treatment of the plaintiff for the time period reflected by the missing records. The defendant objected to this request on the ground that it was overly burdensome, and the deposition did not go forward. On December 15, 1995, the plaintiff again gave notice of the defendant's deposition, this time seeking a complete copy of the plaintiff's medical records and the identity of the doctors and nurses responsible for his care during the missing record period. The defendant moved for a protective order, on the ground that the discovery sought by the plaintiff was "unduly burdensome insofar as [the defendant] already ha[d] provided all of the information that it [was] reasonably able to provide."[12] On

[10]Also named in the complaint were the plaintiff's health maintenance organization, Harvard Community Health Plan (HCHP), and two physicians who had cared for the plaintiff's mother. The claims against these physicians later were dismissed without prejudice.

[11]The defendant also pleaded charitable immunity as an affirmative defense. As will be discussed in note 25, *infra*, the Legislature abrogated the common-law doctrine of charitable immunity in 1971 and, in its place, imposed a statutory cap on tort liability of charitable corporations. See G. L. c. 231, § 85K. In the context of pleading, we consider the concepts of charitable immunity and the charitable cap on damages to be interchangeable.

[12]In a memorandum of law filed in support of its motion for a protective order, the defendant asserted that it had "willingly identified" four caretakers

February 27, 1996, the defendant's motion for a protective order was denied in its entirety by a judge in the Superior Court.

At a subsequent deposition, the defendant (through testimony of two medical records department employees) conceded that the plaintiff's medical records with respect to the eighteen-hour period at issue were missing, and admitted that no attempt had been made to identify those doctors and nurses who had treated the plaintiff during the period reflected by the missing records. The deposition was continued (ostensibly to afford the defendant time to make further efforts to locate the missing records). Testimony taken on the continuance date, however, revealed that the records were still missing, and no effort had been made by the defendant to identify further the doctors or nurses who had treated the plaintiff.

On April 12, 1996, plaintiff filed a motion requesting that, as a sanction pursuant to rule 37 (b) (2), the defendant be precluded from introducing in evidence any testimony regarding the treatment provided to the plaintiff during the hours covered by the missing records. The judge (the same judge who had denied the defendant's motion for a protective order) entered a preliminary order for the appearance, in addition to trial counsel, of the chief medical record librarian of the defendant hospital, together with any other medical record librarians who had been involved in the defendant's search for the missing records, at a hearing on the plaintiff's motion on May 3, 1996.[13] On April 30, 1996, the plaintiff filed a supplemental motion for sanctions, seeking entry of default judgment on liability against the defendant and the striking of its affirmative defense asserting the cap set forth in G. L. c. 231, § 85K. The plaintiff also filed an amended complaint, alleging that the defendant's negligent failure to administer antibiotics during the time period covered by the

---

whose (illegible) signatures appeared on existing records dated May 15, and that the defendant had "no better ability than [did] the plaintiff to determine whether any individuals not indicated in the medical record may have cared for the plaintiff or his mother."

[13]The preliminary order also advised the medical record librarians of their right to be represented by their own counsel at the evidentiary hearing.

missing records caused the plaintiff to suffer brain damage.[14] The defendant once again asserted, as an affirmative defense, the $20,000 statutory cap on damages.

At the May 3 hearing, the defendant suggested that lost hospital records often were discovered misfiled in records of another patient, and described its efforts to locate the missing records.[15] The defendant indicated, however, that it had not contacted physicians named in the existing records, or the defendant's insurer, RMF, to determine whether other documentation regarding the period covered by the missing files existed.

The judge stated that "the number one [priority was to] use all our efforts to get the entire hospital record" and ordered the defendant to "resurrect the missing pages or, in the alternative, [to determine] what might substitute for those missing pages." The judge instructed the defendant to make contact with (1) any physicians identified in the existing records, to determine whether the physicians possessed any records or information with respect to the period reflected by the missing records; (2) RMF, to determine whether it possessed a file of any statements taken by any persons at the time of its investigation in 1987[16]; and (3) the pediatrician on call in the NICU on May 15, 1986,[17] to determine whether he had any records or knowledge about the missing record period.[18]

On September 17, 1996, another judge in the Superior

---

[14]The amended complaint also stated claims for breach of contract and lack of informed consent, and named another physician as a defendant. In November of 1997, the parties stipulated to the dismissal with prejudice of all claims against HCHP (named in the original complaint, see note 10, *supra*) and the physician.

[15]An affidavit of the associate director of medical records services, submitted in connection with the same hearing, stated that the scope of the search had expanded to encompass the records of every in-patient discharged from the defendant hospital in 1986, totaling approximately 40,000 medical records.

[16]Copies of documents compiled by RMF in the course of its investigation of the circumstances surrounding the plaintiff's birth were produced, pursuant to a court order allowing the plaintiff's motion to compel discovery, entered August 5, 1996.

[17]This physician had been named as a defendant in the plaintiff's amended complaint. See note 14, *supra*.

[18]The judge's order, which included multiple instructions to the defendant with respect to the production, or recreation, of the missing records, was not entered on the Superior Court docket.

Court ordered the defendant, pursuant to rule 37, further to answer the plaintiff's interrogatories with respect to the plaintiff's care during the missing record period. On April 14, 1997, the defendant complied with the judge's order. In its answers, the defendant objected to the interrogatories, primarily because the information being sought was "not within [its] actual knowledge, possession, custody or control."[19] The defendant's response identified two physicians who had examined the plaintiff shortly after birth, one of whom was involved in the decision to administer the initial complete blood count and blood culture tests, and one nurse who had drawn the blood for the tests. In response to questions with respect to the identity of the person or persons who received the results of the initial complete blood count and what actions were, or were not taken, in response to the abnormal result, the defendant claimed that it had no information sufficient to respond, because "it ha[d] been unable to locate medical records indicating the time at which the results were received or the identity of the person receiving them."

An evidentiary hearing on the plaintiff's motion for sanctions was next conducted.[20] The plaintiff's position was that, without the missing records, the plaintiff had no ability to prove the al-

---

[19]The defendant also objected to the interrogatories as "overly broad and unduly burdensome in view of the length of time that has elapsed since the events referenced" and potentially implicative of the attorney-client privilege and work product doctrines.

[20]Affidavits supporting the plaintiff's motion included those of two physicians, Dr. Stephen I. Pelton (who is board certified in pediatrics and in pediatric infectious diseases) and Dr. Marcus C. Hermansen (who is board certified in pediatrics and neonatology). The affidavit of Dr. Pelton stated that he had reviewed the plaintiff's existing medical records of the defendant hospital and the records of RMF (including interviews with two doctors named in the RMF's report and an affidavit of the plaintiff's mother (also filed in support of the plaintiff's motion) describing her memory of events during the missing records period. In the opinion of Dr. Pelton, the plaintiff's existing medical records reveal that the plaintiff experienced clinical signs of infection in the first five hours of his life, and that the failure of responsible physicians to order and administer antibiotics constituted a breach of applicable standards of care. Dr. Pelton further opined that the failure of nurses responsible for the plaintiff's care, both in the regular care nursery and in the NICU, to call the plaintiff's condition to the attention of a responsible physician or physicians in a timely manner, constituted departures from the applicable nursing standards of care. According to Dr. Pelton, the departures from standards of care on the

leged malpractice nor to determine the identity of the physicians and nurses responsible for the plaintiff's care. The defendant, in turn, contended that it had made every effort to comply with the plaintiff's requests for production of the records and that it had produced the entire record that was available to it.[21] The defendant argued that the plaintiff's claims raised issues of causation that were required to be determined by a fact finder; that circumstances of the case did not justify even the inference of spoliation, much less the "extraordinary" sanction of a default judgment; and that the judge lacked authority to strike the statutory cap on damages.

Subsequently, the judge entered an order allowing the plaintiff's motion. The defendant was defaulted and its defense under G. L. c. 231, § 85K, was struck. In a written memorandum of decision, the judge stated that, although "[n]o evidence has been presented showing wilfulness or bad faith on the part of [the defendant]," the loss of the plaintiff's records nevertheless amounted to "negligence" in view of the statutory duty to keep records imposed on the defendant hospital by G. L. c. 111, § 70. Further, the defendant's failure to maintain the records deprived the plaintiff of "the opportunity to recover from those individuals directly at fault." The judge reasoned that, without

part of physicians and nurses during the missing records period were "a substantial factor in causing and failing to prevent the severe brain damage which [the plaintiff] suffered as a result of sepsis/meningitis which was not treated with antibiotics in a timely manner."

In his affidavit, Dr. Hermansen attested that he had reviewed the plaintiff's medical records and that, "There is no doubt that [the plaintiff's] brain damage is due to neonatal sepsis and meningitis. There are absolutely no reasonable alternative explanations for his problems." In addition, Dr. Hermansen stated his opinions that the plaintiff presented numerous risk factors of neonatal sepsis following his birth; that antibiotic therapy for presumed neonatal sepsis should have been started at approximately five hours of age; that the failure to start antibiotic therapy was a deviation from the standards of care; and that, if antibiotics had been started in accordance with the standards of care, the plaintiff would have survived his infection with no lasting brain damage.

[21]The defendant initially contended that there was no outstanding discovery order and thus could be no sanction pursuant to Mass. R. Civ. P. 37, as amended, 390 Mass. 1208 (1984). The defendant conceded that point, however, following the judge's query, "[I]s there any question in anybody's mind that the Court has ordered these documents to be found and produced to the plaintiff?," and subsequent pronouncement, "The Court orders you to produce the entire child's record and the mother's record."

the imposed sanctions, the plaintiff "would not be able to prove negligence on the part of the [defendant], and even if [he] could, the damages [he] [has] suffered would greatly exceed the fixed sum [he] would receive. In short, anything less than what [the plaintiff] seek[s], by way of sanctions, would effectively deny the plaintiff[] [his] day in court. . . . Allowing [the defendant] the benefit of the statutory cap provided in [G. L.] c. 231, § 85K, when as a result of [its] negligence the plaintiff[] [is] left without an adequate remedy is contrary to the principles of fairness, equity and justice." The judge noted that, striking the charitable cap as a sanction was fair, because "the hospital and its doctors are insured by the same entity."[22]

1. We first consider the appropriateness of the default sanction. The parties and the judge considered the situation as one arising under rule 37 (b) (2) (C), which authorizes a judge, when confronted with a party who fails to obey an order to provide or permit discovery, to "make such orders in regard to the failure as are just, and among others . . . [a]n order striking out pleadings or parts thereof . . . or rendering a judgment by default against the disobedient party." In view of the judge's determination that the defendant was unable (as opposed to unwilling) to produce the documents, this was not correct. Requests for discovery pursuant to Mass. R. Civ. P. 34 (a), 365 Mass. 792 (1974), require production of documents that "are in the possession, custody or control of the party upon whom the request is served." By these express terms, rule 34 (a) does not demand production of documents that "were in" or that "should have been kept in" the party's possession. Put simply, there can be no discovery violation, and hence no rule 37 sanction, when a party fails to produce documents it does not possess. The parties and the judge cannot be faulted, however, for treating the problem of the missing records as one invoking sanctions for a discovery violation. As indicated above, it was not until the discovery process was well underway that the defendant admit-

---

[22]The defendant's motion for reconsideration of the default order was denied. A motion for summary judgment thereafter filed by the defendant on the ground that the plaintiff's claims were time barred as a matter of law under the statute of repose as then in effect, G. L. c. 231, § 60D, as amended through St. 1979, c. 502, was denied, after a hearing, by a different Superior Court judge.

ted it no longer was in possession of the plaintiff's complete set of medical records.

In retrospect, the matter should have been disposed of under the doctrine of spoliation, which permits the imposition of sanctions and remedies for the destruction of evidence in civil litigation. The doctrine is based on the premise that a party who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results. See *Fletcher* v. *Dorchester Mut. Ins. Co.*, 437 Mass. 544, 549-550 (2002); *Kippenhan* v. *Chaulk Servs., Inc.*, 428 Mass. 124, 127 (1998).[23] See also *Nally* v. *Volkswagen of Am., Inc.*, 405 Mass. 191, 197-198 (1989).

That the missing records vanished years before the commencement of the lawsuit does not make the doctrine of spoliation inapplicable. As we stated in the *Kippenhan* decision, "[s]anctions may be appropriate for the spoliation of evidence that occurs even before an action has been commenced, if a litigant or its expert knows or reasonably should know that the evidence might be relevant to a possible action." *Id.* The judge made no determination with respect to when the defendant knew, or should have known, that litigation was a possibility. The defendant's claim that the missing records were lost long before it was aware (or should have been aware) of the possibility of a suit on behalf of the plaintiff, however, is not supported by the record, which establishes that the defendant should have been aware of a likely claim at least as early as May 1, 1987, the time that it filed a notice with RMF of a potential claim based on the plaintiff's injuries. Under the doctrine of spoliation, the defendant's duty to preserve evidence arose at that time, and any subsequent loss (see 226-227 & note 8, *supra*) of the missing records would render the defendant accountable for the plaintiff's inability to prove his malpractice claim. See *Fletcher* v. *Dorchester Mut. Ins. Co.*, *supra* at 550; *Kippenhan* v. *Chaulk Servs., Inc.*, *supra*.

The defendant's awareness of potential litigation is not the

---

[23]The cases of *Fletcher* v. *Dorchester Mut. Ins. Co.*, 437 Mass. 544 (2002), and *Kippenhan* v. *Chaulk Servs., Inc.*, 428 Mass. 124 (1998), were decided after the judge's entry of sanctions in this case.

only basis on which we treat this matter as spoliation. As recognized by the judge, the defendant also had a statutory obligation imposed by G. L. c. 111, § 70, which provides, in relevant part: "Hospitals or clinics subject to licensure by the department of public health or supported in whole or in part by the commonwealth, shall keep records of the treatment of the cases under their care including the medical history and nurses' notes . . . . Such records shall be in the custody of the hospital or clinic." A related statute, G. L. c. 111, § 70E, provides patients with rights with respect to their medical records kept by a hospital pursuant to § 70, including the right to inspect and receive a copy of their medical records, on request. While the statutory requirement to maintain medical records is grounded, in part, on the need for such records as part of a patient's ongoing medical care, it reflects as well the Legislature's recognition that such records often will be germane to a wide variety of legal claims and proceedings including, but not limited to, medical malpractice claims. The defendant's unexplained loss of the plaintiff's medical records during the period when it was statutorily required to maintain them renders the defendant accountable for the resulting prejudice to the plaintiff. In the spoliation context (like in the discovery context), a judge has broad discretion to impose a variety of sanctions against the defendant for the breach of its statutory duty to retain the plaintiff's missing records.[24]

As a general rule, a judge should impose the least severe sanction necessary to remedy the prejudice to the nonspoliating party. See *Fletcher* v. *Dorchester Mut. Ins. Co., supra* (sanction for spoliation should be "addressed to the precise unfairness that would otherwise result"). See also *Anderson* v. *Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir.), cert. denied, 498 U.S. 891 (1990) (judges should "take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms"). Although the decision to enter a default judgment is committed to the sound discretion of the judge, see *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 441 (1980), we generally

---

[24]This is true regardless whether the plaintiff's medical records were complete at the time they were submitted to RMF, a point which the dissenting opinion disputes. *Post* at 243.

require that the extreme sanction of dismissal or default judgment be predicated on a finding of wilfulness or bad faith, see *Gos* v. *Brownstein*, 403 Mass. 252, 257 (1988), and conclude that such sanctions would not ordinarily be appropriate in a case of negligent spoliation. This is so because "[t]he law strongly favors a trial on the merits of a claim." *Monahan* v. *Washburn*, 400 Mass. 126, 129 (1987) (considering involuntary dismissal under Mass. R. Civ. P. 41 [b] [2], 365 Mass. 803 [1974]).

This is not a case, however, where it has been established that the defendant's failure to comply was due to no fault of its own. See *Societe Internationale Pour Participations Industrielles et Commerciales, S.A.* v. *Rogers*, 357 U.S. 197, 210-211 (1958) (construing Fed. R. Civ. P. 37 [b]). As discussed above, the judge properly discerned that the defendant's failure to preserve hospital records as required by law constituted at least negligence. Moreover, unlike an ordinary case of spoliation, the defendant's violation of the statutory mandate that it both keep records and provide them to patients upon request is a violation that itself gives rise to liability as a form of medical malpractice. See G. L. c. 111, § 70E (giving patients the right to inspect and copy their medical records maintained under § 70, and allowing actions under G. L. c. 231, §§ 60B-60E, if those rights are violated). Finally, the missing records were not simply of potential use to the plaintiff, but formed the critical linchpin of the plaintiff's case.

On this last point, the defendant claims that, because the plaintiff would have been able to establish some proof of his claim without the missing records, the severe sanction of entry of default judgment was both unwarranted and unconstitutional. The judge made every effort to have this case tried on the merits but foresaw no possibility that the missing records could be resurrected. At a hearing on the plaintiff's motion for sanctions held on July 29, 1997, the judge was informed by counsel for the defendant, "[W]e are basically at the end of the line on that issue. All of the cards are on the table and we come before the Court to say we are in an impossible position without those records." In his written memorandum, the judge found that, "[f]rom the evidence presented to this court, the records appear

to be irreparably lost." Due to the defendant's loss of the plaintiff's medical records for the critical hours during which the alleged malpractice occurred, the plaintiff was left with virtually no evidence that could be presented to a jury concerning his clinical features between the hours of 6:30 A.M. on May 15, 1986, and 12 A.M. on May 16, 1986, or what care had been provided him during that time.

With respect to the other essential elements of the plaintiff's claim, the applicable standard of care and causation, the judge was in the best position to assess the credibility of the affidavits of the plaintiff's medical experts and the opinions contained therein. See note 20, *supra.* Although the judge characterized the entry of default judgment as a sanction, imposed to remedy the fatal prejudice to the plaintiff's action, it also could be viewed as reflecting an adverse inference made by the judge, in the absence of any evidence to the contrary, that the missing records would likely contain further proof that antibiotics should have been administered sooner and that the defendant's failure to do so caused the plaintiff's injuries. The judge was aware that the entry of a default judgment against the defendant would deprive it of its day in court, but concluded that, in the special circumstances of this case, "anything less than a default judgment would have the same result on the plaintiff[]."

This case is an exceptional one. The missing records, which the defendant concedes are irreparably lost, contain the only documentation of the critical time period during which the alleged malpractice occurred. Because of the defendant's failure to maintain the missing records, as it was required by law to do, the plaintiff's family will never know for certain what actions were, or were not, taken when the severity of the plaintiff's medical condition became apparent, or the identities of those responsible for his care at that time. On this unique and extraordinary record, we conclude that the judge was within his authority in ordering the sanction of default on the issue of liability.

2. We turn now to the statutory cap on damages imposed by G. L. c. 231, § 85K, concluding that the judge lacked authority to strike the cap as an additional sanction.

General Laws c. 231, § 85K, inserted by St. 1971, c. 785, § 1, provides:

> "It shall not constitute a defense to any cause of action based on tort brought against a corporation . . . that . . . is or at the time the cause of action arose was a charity; provided, that if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation . . . liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. Notwithstanding any other provision of this section, liability of charitable corporations . . . shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes."

The plain text of the statute makes the cap mandatory and contains no language that would warrant its abrogation as a sanction for a violation of the sort that occurred here. Nor does the statutory language, "liability . . . shall not exceed the sum of twenty thousand dollars exclusive of interest and costs," allow an interpretation that negligent conduct on the part of a charitable corporation constitutes a waiver of the mandatory statutory limitation on recovery. The Legislature's purpose behind the charitable cap was "to protect the funds [and other assets] of charitable institutions so they may be devoted to charitable purposes." *English* v. *New England Med. Ctr.*, 405 Mass. 423, 429 (1989), cert. denied, 493 U.S. 1056 (1990). We are bound to give § 85K the scope intended by the Legislature. See *Morrison* v. *Lennett*, 415 Mass. 857, 862 (1993).[25]

Although technically a limitation on liability, the charitable

---

[25]Under common law, a nonprofit hospital such as the defendant enjoyed charitable immunity from tort liability, because funds donated for charitable purposes ought not to be diverted from those purposes to pay damages in tort actions. See *McDonald* v. *Massachusetts Gen. Hosp.*, 120 Mass. 432, 436 (1876). For almost one hundred years, hospitals such as the defendant, incorporated as nonprofit charitable corporations, were protected from liability in malpractice actions by the defense of charitable immunity. See, e.g., *Simpson* v. *Truesdale Hosp., Inc.*, 338 Mass. 787 (1958); *Roosen* v. *Peter Bent Brigham Hosp.*, 235 Mass. 66 (1920). In 1969, in *Colby* v. *Carney Hosp.*, 356 Mass. 527 (1969), this court stated its intention to abolish the doctrine of

cap set forth in § 85K has been treated as an affirmative defense that must be pleaded under Mass. R. Civ. P. 8 (c), 365 Mass. 749 (1974) (listing specific affirmative defenses, and concluding with the residuary clause "any other matter constituting an avoidance or affirmative defense"). See *Harlow* v. *Chin*, 405 Mass. 697, 715 (1989). Factual matters related to the cap may need to be determined by the fact finder, with the burden on the defendant to prove both that it is a charitable organization and that the tort complained of fell within the range of activities covered by the cap. See *id.*; *Grueninger* v. *President & Fellows of Harvard College*, 343 Mass. 338, 340 (1961). The requirement that it be raised as an affirmative defense in such circumstances prevents unfair surprise, a key focus of the requirement of pleading affirmative defenses, and resulting prejudice to the plaintiff.

The characterization of the cap as an affirmative defense, however, does not change its basic nature as a legislatively mandated limit on the amount of civil damages that can be recovered from a charitable corporation that causes harm by committing a tort in the performance of its charitable purpose, no matter how compelling the circumstances of the injured party. The legislative directive relied on by the plaintiff, providing that, "[n]othing in [G. L. c. 231, § 85K,] shall be construed to enlarge any protection from tort liability afforded by the common law of the commonwealth prior to the effective date of this act," St. 1971, c. 785, § 2, does not persuade us otherwise. In our view, the directive refers to the requirement that a charitable corporation must be engaged in its charitable purpose to enjoy the benefit of the cap, just as, at common law, the protection of charitable immunity only extended to negligence com-

charitable immunity the next time it was confronted with the issue, if the Legislature had not acted by that time. Two years later, the Legislature responded by abolishing the defense of charitable immunity from tort liability, but imposing a mandatory limit on liability "if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes." G. L. c. 231, § 85K. See *Mullins* v. *Pine Manor College*, 389 Mass. 47, 63 (1983). This court has upheld the constitutionality of the cap on damages against challenges that it violates principles of equal protection and due process and that it denies a right to a trial by jury. See *English* v. *New England Med. Ctr.*, 405 Mass. 423, 427-431 (1989), cert. denied, 493 U.S. 1056 (1990).

mitted in the course of activities carried on to accomplish charitable activities. The directive provides no basis for striking the charitable cap as a sanction for the loss of relevant evidence in a tort action where, as here, both parties agree that the alleged malpractice occurred when the defendant was performing its charitable activities.[26]

Here, the statutory cap was raised by the defendant in a timely manner, and there is no claim of surprise. It was undisputed that the defendant is a charitable corporation and that it was acting in the performance of its charitable purposes when the harm occurred. The judge ordered that the charitable cap be struck, not to cure prejudice because the defendant had failed timely to plead the limitation, nor because the defendant failed to comply with an order to provide discovery seeking information concerning its charitable status or whether the plaintiff's injuries occurred during commercial, rather than charitable, activities. Rather, the judge reasoned that § 85K would not apply to physicians and nurses on the defendant's staff, for whose negligence the defendant (presumably) would be vicariously liable in any event, see *Mullins* v. *Pine Manor College*, 389 Mass. 47, 63 (1983), and ordered the cap struck in an attempt to remedy what he (correctly) perceived to be a horrific wrong done to the plaintiff for which the defendant was responsible. This is not a proper result. The charitable cap may be waived, of course, if a party agrees, but, for reasons stated above, cannot be struck as a sanction when, as here, both parties agree that the cap is applicable, on the grounds that the cap is "unfair" or otherwise to achieve an equitable result. That the hospital and its employees who may have been responsible for the plaintiff's injuries (who are not protected by the charitable cap but were not named

[26]This interpretation is consistent with our treatment of the similarly worded statutory cap on governmental liability set forth in G. L. c. 258, § 2, the Massachusetts Tort Claims Act, which provides, in relevant part, that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers shall not be liable . . . for any amount in excess of one hundred thousand dollars." See *Ayala* v. *Boston Hous. Auth.*, 404 Mass. 689, 703-705 (1989); *Irwin* v. *Ware*, 392 Mass. 745, 766 (1984).

defendants in this action, primarily due to the plaintiff's inability to discover their identity) are insured by the same insurance company was not a proper basis on which to strike the cap. See *Johnson* v. *Wesson Women's Hosp.*, 367 Mass. 717, 718-719 (1975); *McKay* v. *Morgan Memorial Coop. Indus. & Stores, Inc.*, 272 Mass. 121, 126 (1930). See also *Ayala* v. *Boston Hous. Auth.*, 404 Mass. 689, 704-705 (1989).

Two final points are in order with respect to the dissenting opinion's position that the judge properly struck the charitable cap as a sanction under rule 37 for the defendant's failure to produce the missing records. The first concerns the dissent's reliance on G. L. c. 111, § 70, as the source of the defendant's duty to preserve the plaintiff's medical records. *Post* at 245. That statutory scheme, as has been mentioned, provides that the violation of a patient's rights, including the right "upon request, to inspect his medical records and to receive a copy thereof in accordance with [G. L. c. 111, § 70]," is in and of itself a form of actionable malpractice. G. L. c. 111, § 70E. Damages in any such malpractice action, however, if brought against a health care provider entitled to the charitable cap, would be capped at $20,000. It would be anomalous indeed to impose a remedy under the rules of civil procedure for the violation of a statutorily imposed duty that goes beyond the remedy provided under the statute creating the duty in the first place.

The second takes issue with the assertion that allowing the statutory cap in this case "condone[s] the poor record-keeping practices of the hospital." *Post* at 247. It is difficult to understand in what manner the entry of a default judgment against the defendant "sends the message to charitable hospitals that 'losing' medical records will shield their employee physicians from liability." *Post* at 247. Both parties agree that, even were the missing records available and the information contained therein proved the plaintiff's malpractice claim against the defendant, a verdict for the plaintiff would, as matter of law, be limited by the statutory cap. The dissent's suggestion, *post* at 247, that the court's decision essentially "reward[s]" the defendant for the intentional destruction of documents by its employees is simply not supported in fact or law.

Our conclusion that the spoliation remedies available to the

judge does not include striking the cap unquestionably causes an unusually harsh result for the plaintiff and his family. We are, however, bound by the Legislature's determination of the matter. See *Morrison* v. *Lennett*, 415 Mass. 857, 862 (1993) (§ 85K must be given scope intended by Legislature). In the absence of an expression of legislative intent that there be exception from the charitable cap in circumstances such as these, we cannot create one. See *Prudential Ins. Co.* v. *Boston*, 369 Mass. 542, 547 (1976); *Enos* v. *Correia*, 38 Mass. App. Ct. 318, 322-323 (1995).[27]

3. So much of the judgment imposing liability on the defendant is affirmed. The assessment of damages in the judgment is vacated. Damages are to be assessed in the amount of $20,000 plus interest and costs.

*So ordered.*

IRELAND, J. (dissenting). I dissent from the court's opinion. I do so because I believe that this is not a spoliation case at all, but rather involves Mass. R. Civ. P. 37 (b) (2) (C), as amended, 390 Mass. 1208 (1984), as the parties, the trial judge, and the Appeals Court believed.[1] As such, it was well within the motion judge's discretion to strike the defendant's affirmative defense, in this situation, its charitable immunity status. I have previously expressed my concern over the harsh results mandated by legislative statutes that confer immunity,[2] but agreed that in those cases we were bound to the outcome. The notion of a charitable immunity cap is unfair, obsolete, and fails to properly balance the interest of the innocent victim and that of the

[27]In view of this conclusion, it is unnecessary to address the plaintiff's claim that he was entitled to be compensated, as a separate item of general damages, for the loss of enjoyment of life (now and in the future) that he would have experienced but for his injuries.

[1]The court, in one sentence, *ante* at 234, characterizes this situation as more properly a spoliation matter, while both parties' numerous briefs concede that this was not spoliation, as the destruction or loss of documents more than likely took place long before notice of possible litigation had occurred.

[2]See *Barnett* v. *Lynn*, 433 Mass. 662, 667-668 (2001) (Ireland, J., concurring); *Brum* v. *Dartmouth*, 428 Mass. 684, 708 (1999) (Ireland, J., concurring).

negligent charitable organization. Here, the court rewards the defendant for negligent record-keeping practices, which has left the plaintiff unable to present a triable issue of fact. This is a situation where the court should be able to exercise its discretion, and common sense, in striking the charitable immunity cap.

First as to spoliation, I believe that this is not the proper doctrine by which the plaintiff can receive a default judgment. The court correctly asserts that the concept of spoliation binds a party to preserve evidence that may be relevant to a potential suit even before an action has commenced, so long as "a litigant or its expert knows or reasonably should know that the evidence might be relevant to a possible action." *Kippenhan* v. *Chaulk Servs., Inc.,* 428 Mass. 124, 127 (1998). The court states that the defendant was on notice and its "duty to preserve evidence arose" at the time its insurance company (RMF) produced an investigatory report, approximately one year after the plaintiff was born. *Ante* at 234. According to the *Kippenhan* decision, documents destroyed subsequent to this point would fall under spoliation. *Id.* The problem is, contrary to the court's unsupported assertion, it is just as likely the missing documents were lost or destroyed prior to RMF issuing its investigative report.

The court cites language from RMF's investigative report to support the theory that the timing of the loss of records is "more certain," because the records submitted to RMF, "*appear* to have been complete at [the time of RMF's report]." *Ante* at 227. This is an improper inference and cannot be drawn from the documents before us. There is nothing in RMF's report that could not be gleaned by examining the still-present information contained in the plaintiff's medical records.

The complete blood count (CBC) test referred to in the language, "it is questionable whether or not antibiotics should have been initiated sooner in view of a shift to the left by the complete blood count which would indicate an infection was going on," is contained in the current record. Had the records provided to the insurance company contained the name of the doctor who opted not to medicate as a result of the 7:34 A.M.

CBC,[3] one would think RMF would have noted the name, considering this was the ultimate question concerning potential liability. In fact the only two mentions of time in RMF's report bookend the missing record period, and are found on notes still contained in the current record.

The first mention of time by the RMF report is of 6 A.M. May 15, 1986, in a record stating when the plaintiff was brought to the special care nursery. He was then sent back to the regular nursery by a physician noted by RMF as "Dr. O'Drisewell." This documentation still exists, in fact, it is the last record of care regarding the plaintiff immediately prior to the missing record period (and is actually signed by one "Dr. O'Driscoll," not Dr. O'Drisewill as noted by RMF). This document notes to hold antibiotics pending CBC results, the exact and only issue identified by RMF's report as a potential malpractice liability. The next time reference contained in the insurance report (which is the next sentence in the report) is 7 A.M., May 16, 1986, when the plaintiff was returned to the special care nursery. This notation marks the resumption of the record-keeping after the missing record window. It appears more than likely that the missing records were never viewed by RMF at all, and that the records were destroyed or lost long before the initial RMF report. Thus the conclusion reached by the court that the now missing records were present at the time of RMF's report and were subsequently lost or destroyed, is error.

It is for this reason that neither the trial court, the Appeals Court, the plaintiff, nor the defendant, considered this a spoliation case. Because it is impossible to determine exactly when the records disappeared, and it is just as likely they disappeared before the defendant was on notice of a potential law suit, the situation does not fall under spoliation criteria. Our case law is clear that in order for spoliation to apply, the documents must be destroyed by the potential party at a time when it knows, or should know, of the possibility of a law suit. See *Kippenhan* v. *Chaulk Servs., Inc., supra.* It is impractical to hold hospitals liable for spoliation in every instance of missing medical documents, unless there is some sort of notice aside from an adverse

---

[3]The still existing hematology report lists the time as 7:34 A.M., while the microbiology report lists the specimen time at 6:25 A.M.

outcome after medical treatment. On the evidence before us, it is improper for this court to determine the point in time that the documents were lost, when the judge himself was unable to make such a finding. In invoking the spoliation doctrine, the court needlessly delves into the propriety of default judgment for a spoliation violation.[4]

Because it is more likely the documents were lost prior to any notice of suit, this case was properly characterized as a rule 37 (b) (2) (C) discovery sanction. The defendant unquestionably had a statutorily imposed responsibility to keep and preserve the plaintiff's medical records. See G. L. c. 111, § 70. It was therefore not an abuse of discretion for the judge to sanction the defendant for the inability to produce documents that it had an obligation to maintain. See *Societe Internationale Pour Participations Industrielles et Commerciales, S.A.* v. *Rogers*, 357 U.S. 197, 206-209, 212 (1958) (sanction of dismissal for inability to comply with pretrial production order not warranted when inability to comply not due to litigant's own conduct or circumstances within its control). Nor was it abuse of discretion under rule 37 for the trial judge to issue a default judgment where he found that with everything before the court, the plaintiff was left without a remedy due to the negligent mishandling of the plaintiff's records by the defendant.

Second, because noncompliance with a discovery order is grounds for an appropriate sanction under rule 37 (b) (2) (C), it was not abuse of discretion to strike the charitable immunity cap. See *Gos* v. *Brownstein*, 403 Mass. 252, 255-256 (1988) (sanctions need not be based on a wilful failure to comply with discovery order). Although the charitable immunity cap under G. L. c. 231, § 85K, is mandated by the Legislature, the very words of the statute when examined in light of the legislative intent, allow the judiciary the ability to strike the cap in limited circumstances.

The charitable immunity cap must be affirmatively pleaded

---

[4]We have recently held that there cannot be a separate cause of action in tort for spoliation of evidence. See *Fletcher* v. *Dorchester Mut. Ins. Co.*, 437 Mass. 544, 550-552 (2002). For the court to allow a spoliation sanction to become a default judgment would circumvent that reasoning. For this reason alone, even if the court was correct in its application of spoliation, affirming a default judgment in this case is improper.

by a defendant, and thus should be subject to both waiver and sanction. See Mass. R. Civ. P. 37 (b) (2) (C). Both the common-law history and the legislative history of the charitable immunity cap warrant this conclusion. Prior to the enactment of § 85K, charitable immunity was recognized as an affirmative defense in tort liability. See *Grueninger* v. *President & Fellows of Harvard College*, 343 Mass. 338, 339 (1961). In response to this court's announcement of its intention to abolish the affirmative defense, *Colby* v. *Carney Hosp.*, 356 Mass. 527, 528 (1969), the Legislature enacted § 85K.[5] The statute capped charitable immunity liability at $20,000, and stated that it "shall not be construed to enlarge any protection from tort liability afforded by the common law of the commonwealth." St. 1971, c. 231, § 2. With this guidance, it is not an abuse of authority for a court to strike the affirmative defense of charitable immunity in the appropriate circumstances.

Even the court implies that under rule 37, a judge could essentially strike a charitable immunity pleading in certain circumstances, for example, when a charitable institution fails to plead its status in a timely manner. See *ante* at 240. To penalize the charitable institution for that discovery violation, but not for the negligent handling of patient records, is hard to understand. There is no evidence of legislative intent in support of striking the charitable immunity cap for one discovery violation over another.

Although this particular case presented us with an avenue to strike the charitable immunity cap, I urge the Legislature to act in order that Massachusetts align with the vast majority of States in recognizing that the charitable immunity cap has become obsolete, unfair, and expanded beyond its original intent. In rejecting charitable immunity, the Restatement

[5]The original bill provided broad charitable immunity protection, and failed to mention the common-law defense. 1971 House Doc. No. 5801. In response, the Governor recommended the bill be amended and wrote, "I can see no justification for expanding the doctrine of charitable immunity, but rather support [an approach] which severely limits the application of the doctrine," as this defense must be balanced "against the interest of the person who is injured as a result of a tort for which the nonprofit is responsible." 1971 House Doc. No. 5976, at 2, quoting Forty-Sixth Report of the Judicial Council, Pub. Doc. No. 144 (1971).

(Second) of Torts states, "One engaged in a charitable, educational, religious or benevolent enterprise or activity is not for that reason immune from tort liability." Restatement (Second) of Torts § 895E (1979). The great majority of jurisdictions support this section, as the need for abrogation of liability in a field such as healthcare no longer makes sense. See *id.* at Reporter's Note, and cases cited. "[I]t is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness." 15 Am. Jur. 2d § 184, at 172-173 (2000).

When people avail themselves to the services of a hospital, they are often at their most vulnerable. By allowing a hospital to shield itself from liability for its negligent practices, the charitable immunity cap is doing a disservice to the public by allowing substandard treatment practices to be rewarded by virtue of a corporate status. The availability of the judicial system to victims of malpractice is an essential avenue that propagates higher standards of medical treatment. By limiting the liability of the charitable hospital, the Legislature is effectively allowing a hospital to hide negligent practices. This decision sends the message to charitable hospitals that "losing" medical records will shield their employee physicians from liability.[6]

What the court has successfully done is to condone the poor record-keeping practices of the hospital, or even reward the destruction of documents by employees who otherwise would potentially face a law suit. While it is possible the documents were lost, it is also just as likely that they were intentionally destroyed. If the hospital is not liable in the physician's stead, what incentive is there for the hospital to conduct internal

---

[6]With the loss of the critical medical records, the plaintiff is foreclosed from recovering against any physicians who may have treated him during the missing record period. While the availability of these records would not expose the defendant hospital to liability in excess of the statutory cap, it certainly may expose the applicable physicians to liability. In this way, the loss of medical records directly benefits physicians of charitable hospitals by totally shielding them from liability if crucial patient records are lost. Thus, the court's decision could serve to encourage poor supervision of record keeping, as well as administrative review of physician performance, at charitable hospitals.

investigations to arrive at the identity of the caregiver? This is not a hypothetical question, this is what we are faced with in this case.

While the Legislature may intend to shield charities from tort suits, it does not intend to allow employees to hide behind the same shield. By virtue of the missing records, all of the physicians potentially responsible for the plaintiff's brain damage have been allowed to escape liability. When the defendant negligently failed to maintain the documents, it essentially acted as a shield to the physicians involved in the plaintiff's treatment. Like in *Brum* v. *Dartmouth*, 428 Mass. 684 (1999), which involved a school's escaping legal accountability, I believe that when one avails himself of a hospital, he should be able to expect a certain degree of care. See *id.* at 709-710 (Ireland, J., concurring) (school officials should not be deliberately indifferent to imminent threat of safety to one of its students). Hospitals have a responsibility to supervise the practice of medicine that occurs within their doors, and to provide as safe an environment as possible for the critically ill patients that avail themselves of medical treatment.

The result reached by the majority is not only harsh, but contrary to common sense and legislative intent to balance the interests of the charitable immunity with that of the citizens of the Commonwealth. I would therefore affirm the judge's ruling.