Lois J. Ayash *vs.* Dana-Farber Cancer Institute & others.[1]

Suffolk. October 6, 2004. - February 9, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Sosman, & Cordy, JJ.

*Privacy. Doctor,* Employment. *Hospital,* Peer review, Appointment to staff. *Contract,* Implied covenant of good faith and fair dealing, Physician, Employment, Interference with contractual relations. *Employment,* Retaliation. *Charity. Corporation,* Charitable corporation, Non-profit corporation. *Damages,* Employment contract, Libel. *Libel and Slander. Contempt.*

A doctor seeking damages against a hospital (her former employer), among others, in connection with a series of events that occurred in the aftermath of the discovery that two patients at the hospital had been administered an overdose of a highly toxic chemotherapy drug, which resulted in the death of one of the patients, was not entitled to relief under G. L. c. 214, § 1B, on the ground that her right to privacy had been invaded by the hospital's public disclosure that peer review action was proceeding against the plaintiff or by the hospital's actions in providing to a newspaper reporter confidential peer review documents that suggested some responsibility on the plaintiff's part for the overdoses, where the disclosures were limited to the plaintiff's professional involvement in a matter that already was the focus of a high degree of public scrutiny and interest and were not, in any event, of an exceedingly personal or intimate nature [382-385]; further, even assuming that the hospital breached its implied covenant of good faith and fair dealing by failing to follow the procedure described in its bylaws before restricting the plaintiff's clinical privileges following the overdoses, the plaintiff failed to demonstrate that she suffered compensable loss as a result of the breach [385-388]; however, where a reasonable jury could conclude that the hospital's decision not to renew the plaintiff's appointment was motivated by retaliatory animus fueled by the plaintiff's filing of a lawsuit against the hospital alleging gender discrimination, judgment in favor of the plaintiff on her claim of retaliation in violation of G. L. c. 151B, § 4 (4), was warranted [388-389].

This court concluded, based on the legislative history and plain language of the statutes in question, that the charitable cap on damages under G. L. c. 231, § 85K, limiting the tort liability of a charitable entity to $20,000, was not applicable to limit damages awarded pursuant to a successful claim of unlawful retaliation in the employment context under G. L. c. 151B, § 4 (4). [389-392]

[1]David M. Livingston, Globe Newspaper Company, Inc., and Richard A. Knox (the latter two collectively referred to as the Globe defendants).

In an action where undifferentiated lump sum damages were awarded against a hospital for invasion of privacy, breach of the implied covenant of good faith and fair dealing, and retaliation, but where the verdicts on the first two claims were vacated on appeal, this court remanded the issue of damages for a new trial. [392-393]

In an action brought by a doctor seeking damages against a hospital's physician-in-chief (defendant), among others, claiming that the defendant intentionally interfered with the contractual relationship between the plaintiff and the hospital by wrongfully inducing the hospital not to extend the plaintiff's employment in the aftermath of the discovery that two patients at the hospital had been administered an overdose of a highly toxic chemotherapy drug, which resulted in the death of one of the patients, the judge erred in denying the defendant's motion for judgment notwithstanding the verdict, where the verdict against the defendant was tainted by the improper admission in evidence of confidential peer review documents protected under G. L. c. 111, § 204 (a), and where, in the absence of such evidence, the defendant's challenged conduct could not be said to be improper in motive or means. [393-399]

A Superior Court judge did not abuse his discretion in finding that the ongoing refusal of certain defendants (a newspaper and a newspaper reporter) to comply with a discovery order directing them to disclose certain confidential sources to the plaintiff warranted, as a sanction pursuant to Mass. R. Civ. P. 37 (b) (2), that judgments of liability enter in favor of the plaintiff on all of her remaining claims against the defendants, where the defendants' refusal to comply resulted in the plaintiff's inability to proceed against other defendants on certain claims, and where the judge left open to the defendants the option to remove the default by complying with the discovery order [399-404]; further, the jury's award of damages on those default judgments was not clearly excessive in relation to what the plaintiff's evidence had demonstrated damages to be [404-407].

CIVIL ACTION commenced in the Superior Court Department on February 1, 1996.

After certain discovery matters were heard by *Peter M. Lauriat*, J., the case was tried before *Catherine A. White*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Kenneth W. Salinger* (*Steven L. Schreckinger* with him) for Dana-Farber Cancer Institute & another.

*Joan A. Lukey* (*Gabrielle R. Wolohojian* with her) for the plaintiff.

*Jonathan M. Albano* (*George Freeman*, of New York, & *Martin F. Murphy* with him) for Globe Newspaper Company, Inc., & another.

The following submitted briefs for amici curiae:

*Carl Valvo* for Professional Liability Foundation, Ltd., & others.

*Steven S. Locke* for Massachusetts Commission Against Discrimination.

*Robert S. Mantell, Jonathan J. Margolis, & James E. Fitzgerald* for Massachusetts Employment Lawyers Association.

*Laura R. Handman & Jeffrey L. Fisher,* of the District of Columbia, for ABC, Inc., & others.

GREANEY, J. The plaintiff, Dr. Lois J. Ayash, commenced this action in the Superior Court against the defendants, the Dana-Farber Cancer Institute (Dana-Farber or the hospital); Dr. David M. Livingston; Globe Newspaper Company, Inc., publisher of the Boston Globe (Globe); and Globe reporter Richard A. Knox, seeking damages in connection with a series of events that occurred in the aftermath of the discovery that two patients enrolled in an experimental breast cancer treatment study at Dana-Farber had mistakenly been administered a four-fold overdose of a highly toxic chemotherapy drug. One of the patients, Globe health columnist Betsy A. Lehman, died as a result of the overdose. In her complaint, the plaintiff accused the Globe and Knox (together, Globe defendants) of publishing a series of scathing and inaccurate articles about the overdoses and an alleged coverup by Dana-Farber that erroneously attributed culpability to the plaintiff, thereby destroying her reputation and her well-being. The plaintiff's complaint also accused Dana-Farber and Livingston (who was physician-in-chief at Dana-Farber at the time of the overdoses and their discovery) of inappropriately focusing public attention on her, by issuing press releases containing confidential peer review information and by secretly providing to Knox other confidential peer review information. This was done, the plaintiff alleges, in order to deflect attention from widespread deficiencies in the hospital that led to the overdoses and in order to protect other physicians at the hospital. The plaintiff's amended complaint, as far as now relevant, states claims against (1) Dana-Farber for invasion of privacy, breach of the implied covenant of good faith and fair dealing, and unlawful retaliation in violation of G. L. c. 151B,

§ 4 (4)[2]; (2) Livingston for intentional interference with contractual relations; (3) the Globe defendants for libel and defamation[3]; and (4) Knox for intentional interference with contractual relations and for intentional or negligent infliction of emotional distress.

During the discovery stage of the litigation, the plaintiff sought the identities of sources consulted by Knox before writing articles, subsequently published in the Globe, that formed, at least in part, the basis of the plaintiff's lawsuit. After the Globe defendants' steadfast refusal to provide information that would lead to the identities of Knox's confidential sources, despite a court order to disclose their identities, a judgment of civil contempt was entered in the Superior Court against the Globe defendants. The Appeals Court vacated the order to disclose and the contempt order, concluding that the defendants had made "some showing" that disclosure of Knox's confidential sources presented a danger to the free flow of information that was more than theoretical or speculative. See *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. 384 (1999). On remand, the judge allowed the plaintiff's renewed motion to compel the Globe defendants to disclose the identities of their confidential sources. When the Globe defendants continued to refuse, the judge ultimately entered, as a sanction pursuant to Mass. R. Civ. P. 37 (b) (2), as amended, 390 Mass. 1208 (1984), pretrial default judgments of liability in favor of the plaintiff on her claims against the Globe defendants.[4]

After five weeks of trial (presided over by a different judge

---

[2]The plaintiff also asserted a claim against Dana-Farber for gender discrimination and a claim against Dana-Farber and Livingston for defamation and libel. The jury returned verdicts in favor of the defendants on these claims, and the plaintiff does not challenge the verdicts. The plaintiff also asserted a separate claim against Dana-Farber for breach of contract that was submitted, with no objection, to the jury as part of the claim for violation of the implied covenant of good faith and fair dealing.

[3]The plaintiff also asserted a claim against the Globe defendants for invasion of privacy. The judge granted a motion filed by the Globe defendants for partial summary judgment dismissing this claim, and the plaintiff has not appealed from that partial summary judgment.

[4]The Globe defendants immediately filed notice of an appeal of the default judgments. A judge in the Superior Court (not the one who entered the sanction orders) granted the plaintiff's motion to strike the appeal on the ground that the appeal was not ripe until after damages had been assessed.

than the judge who had dealt with discovery), a jury in the Superior Court found Dana-Farber liable for (1) violation of the plaintiff's statutory right to privacy under G. L. c. 214, § 1B; (2) breach of the covenant of good faith and fair dealing implied in its employment contract with the plaintiff; and (3) unlawful retaliation in violation of G. L. c. 151B, § 4. The jury also returned a verdict in favor of the plaintiff on her claim that Livingston intentionally had interfered with her employment relationship with Dana-Farber. The jury awarded damages against Dana-Farber in the amount of $180,000 for lost compensation and injury to business reputation, $1,080,000 for emotional distress, and $5,000 in punitive damages[5]; the jury also awarded damages against Livingston in the amount of $120,000 for lost compensation and injury to business reputation, and $720,000 for emotional distress. For the plaintiff's defaulted claims against the Globe defendants, the jury awarded her the sum of $1,680,000 against the Globe (reflecting $240,000 in economic damages and $1,440,000 in emotional distress damages) and $420,000 against Knox (reflecting $60,000 in economic damages and $360,000 in emotional distress damages).

The judge heard motions filed by Dana-Farber and Livingston for the entry of judgment notwithstanding the verdicts; a motion filed by Dana-Farber requesting that the charitable cap, G. L. c. 231, § 85K, be applied to the judgment against it; a motion filed by the Globe defendants challenging the default judgments; and motions for a new trial (or, alternatively, for remittitur) based on excessive damages submitted by all of the defendants. The judge upheld the verdicts against Dana-Farber and Livingston, but agreed that the charitable cap applied to the damages awarded against Dana-Farber. The judge declined to revisit the default judgment (which, as noted, had been entered by another judge). Finally, the judge concluded that damages awarded by the jury, although high, were not excessive and denied all of the defendants' motions for remittitur. An amended

---

[5]Dana-Farber did not appeal from the award of punitive damages. Also not at issue are almost $400,000 in attorney's fees and costs awarded the plaintiff pursuant to her successful G. L. c. 151B claim against Dana-Farber.

judgment was entered allowing the plaintiff to recover the sum of $20,000 (plus costs and interest) from Dana-Farber.[6]

The case is before us on cross appeals. The plaintiff appeals the judge's application of the charitable cap. Dana-Farber appeals the denial of its motion for judgment notwithstanding the verdicts on the retaliation, privacy and implied contract claims. Livingston appeals the denial of his motion for judgment notwithstanding the verdict on the intentional interference claim. The Globe defendants appeal the imposition of the sanction of default judgment against them. All of the defendants appeal the denial of their motions for remittitur, or for a new trial, on the issue of excessive damages. We granted the parties' applications for direct appellate review.

For reasons that follow, we vacate the judgments against Dana-Farber for invasion of privacy and for breach of the implied covenant of good faith and fair dealing, and against Livingston for interference with employment relations, and direct the entry of judgments for Dana-Farber and Livingston on those claims. We affirm the verdict against Dana-Farber for the G. L. c. 151B unlawful retaliation claim and conclude that the charitable cap set forth in G. L. c. 231, § 85K, does not apply to damage awards for unlawful retaliation under G. L. c. 151B. We affirm the default judgments, and the corresponding damage awards, against the Globe defendants. Vacating the judgments against Dana-Farber for invasion of privacy and breach of the implied covenant creates a defect in the damages awarded against Dana-Farber that necessitates a retrial on damages. Accordingly, we remand the case to the Superior court for a new trial on the damages to be awarded against Dana-Farber.

1. We begin with an overview of the facts in the light most favorable to the plaintiff. See *Situation Mgt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 876 (2000); *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 438 (1992). Additional facts will be discussed as they relate to the parties' claims of error.

---

[6]The jury originally awarded damages against Dana-Farber and Livingston jointly. The judge allowed the unopposed motion of Dana-Farber and Livingston to correct the judgment of joint liability to rest against Dana-Farber alone.

a. *The overdoses and the immediate aftermath of their discovery.* In November, 1994, a research fellow at Dana-Farber, Dr. James Foran, accidentally ordered four-fold overdoses of cyclophosphamide, a powerful chemotherapy drug with well known heart toxicity, for two patients in an experimental proto-col[7] for breast cancer patients (protocol 94-060) administered under the auspices of Dana-Farber's Solid Tumor Autologous Marrow Program (STAMP).[8] The plaintiff was protocol chair and principal investigator for protocol 94-060. The overdoses were separately administered to two patients, Betsy Lehman and Maureen Bateman, over the course of four days beginning on November 14 and November 16, respectively. The attending physician on duty at the time the orders were written, and the overdose administered to Lehman, was Dr. Gary N. Schwartz. The attending physician on duty at the time the overdose was administered to Bateman was Dr. Anthony Elias, the director of STAMP. Both patients suffered almost immediate adverse reac-tions to the cyclophosphamide treatment. Bateman survived the overdose but experienced severe cardiac damage. Lehman died on December 3 as a result of the overdose. An autopsy failed to uncover the cause of her death.

The plaintiff began a rotation as the attending physician for Lehman and Bateman on December 1. On the morning after Lehman's death, the plaintiff inquired of another STAMP team physician, Dr. Richardson, whether the correct chemotherapy dose had been administered to Lehman. Richardson responded in the affirmative.[9] As protocol chair and co-director of the STAMP team, the plaintiff informed the director of protocol administration at Dana-Farber of Lehman's death and provided him with pharmacological data about the blood levels of cyclo-

---

[7]The plaintiff's complaint describes a protocol as a "formal research program[] which may involve clinical aspects if experimentation upon human beings is a necessary part of the research effort." We understand a protocol to be, in the context of this case, an experimental treatment plan.

[8]The STAMP team at Dana-Farber was comprised of several physicians (including the plaintiff), pharmacologists, and other medical care providers.

[9]Only later did it become apparent that Richardson understood the plaintiff to have inquired whether Lehman's potassium level had been checked. Rich-ardson's affirmative answer, thus, was addressed to the question of potassium level and not (as believed by the plaintiff at the time) to whether the proper dose of cyclophosphamide had been administered.

phosphamide and its metabolite in Lehman and in other patients participating in protocol 94-060.[10] To the plaintiff, and to other STAMP team physicians, the data appeared inconclusive. At a meeting approximately two weeks later, the plaintiff, based on her earlier conversation with Richardson, informed a group of STAMP team physicians and members of Dana-Farber's pharmacology department that the cyclophosphamide administered to Lehman had been the correct dosage. During a medical staff retreat, the plaintiff presented the pharmacological data and clinical scenario of all four patients who had undergone protocol 94-060 and stated her view that Lehman's death most probably reflected a modulation of cyclophosphamide. Those present voiced no disagreement.

It was not until on or about February 8, 1995, that a Dana-Farber data manager discovered the overdosing errors. The plaintiff reported the errors to Dana-Farber's human protection committee on the following day. The hospital immediately notified both patients' families of the tragic error and suspended all clinical work under protocol 94-060. Livingston, as the hospital's physician-in-chief, began his own informal investigation into the incident by inquiring of other physicians, including Dr. Schwartz and Dr. Foran, as to their version of events. Livingston, however, did not seek the plaintiff's view as to what had occurred.

Dana-Farber established three committees to investigate the circumstances of the overdoses and the hospital's subsequent failure to discover them. First, it convened an internal peer review committee, chaired by Dr. Steven E. Sallan (Sallan committee),[11] to focus on how the overdoses occurred and to recommend steps to prevent a similar tragedy in the future. Dana-Farber also appointed an external peer review committee (Devita committee), headed by Dr. Vincent T. Devita, a national leader in oncology and former director of the National Cancer Institute, to review the Sallan committee report and, if necessary,

---

[10] The plaintiff did not inform him about Bateman's adverse reaction at this time.

[11] Sallan held that position until early May, 1995, when his appointment to serve as Dana-Farber's physician-in-chief was announced. At that time, Dr. Frederick P. Li replaced Sallan as head of the committee. Sallan remained a member of the committee.

independently investigate circumstances leading to the overdose. Finally, an internal Dana-Farber audit team was established to perform an in-depth investigation of protocol 94-060 itself.

On March 22, 1995, Livingston issued two statements. First, in a statement to hospital staff, he described the overdose incidents and the steps that had been, or would be, taken by Dana-Farber in response. Second, in a statement to the news media, Livingston admitted that the overdoses resulted from "human error" and announced that Dana-Farber had "taken additional precautions to ensure that they do not happen again," including the establishment of "two internal review committees and an external review committee" that had been "asked to examine all issues related to this situation." Livingston stated that "once all the facts have been fully analyzed, and the causes of the errors identified," Dana-Farber would "make available to the public the conclusions and recommendations of the committees." The next day, two physicians and three pharmacists were placed on administrative duty and restricted from clinical practice. The plaintiff was not one of those whose clinical privileges were restricted.

b. *Reporting of the overdoses by the Globe.* The discovery of the overdoses was of considerable public interest. Dana-Farber became the subject of intense media coverage, including that in the Globe.[12] On March 23, 1995, the day after Livingston issued the hospital's first press release on the overdoses, the Globe published a front page article, authored by Knox, entitled "Doctor's orders killed cancer patient." With respect to the overdose administered to Lehman, the article ascribed the erroneous order to a "physician working as a research fellow," but noted that "[f]ive or six other doctors and nurses countersigned the mistaken order, including Dr. Lois J. Ayash, leader of the team." The plaintiff was the only physician named in the article as having any connection to the overdose. Moreover, contrary to what was stated in the article, the plaintiff had not

---

[12]According to the Globe, it ultimately published almost fifty articles about or related to the overdoses, systemic safeguards, and, generally, the quality of health care at hospitals everywhere. Knox testified at trial that he authored only approximately twenty-seven of these articles and that only six of the articles mentioned the plaintiff by name.

countersigned the overdose order, nor was she the "leader of the team." Despite this error in reporting, no effort was made by Dana-Farber, or by Livingston, to correct the impression that the plaintiff shared responsibility for the overdose error.[13]

On March 24, 1995, the Globe published an editorial concerning the overdoses. The editorial characterized the overdose error as "so glaring that any first-year medical student should have spotted it." The following day, the Globe published an article written by another Globe columnist, Bella English. The column did not mention the plaintiff by name, but described the overdoses as "an appalling series of errors that would make The Three Stooges look like brain surgeons" and stated that the incompetence was "nothing less than criminally negligent homicide."

When Knox directly questioned Livingston as to whether the Globe had been correct in naming the plaintiff as a countersigner of the erroneous order, Livingston chose to remain silent. Knox interviewed Livingston on March 25. The next day, a second article written by Knox appeared in the Globe, entitled "Dana-Farber studies pattern in overdoses." The article stated that an internal investigation conducted by Dana-Farber was "focusing on why two subsequent patients [in protocol 94-060] got the correct dosage" and suggested that the overdoses could have been "noted by someone on the care team and quietly corrected." The article went on to quote Livingston as stating that the question of a possible cover up was "right smack in the bull's eye" of Dana-Farber's investigation. Livingston was quoted as stating, "It's right in the target range."

    c. *Dana-Farber's focus on the plaintiff and the Globe's coverage alleging her culpability.* Article 6 of Dana-Farber's medical staff bylaws contemplate the possibility that "corrective action" be taken against medical staff members for due cause, including, among other things, "conduct that might be inconsistent with or harmful to good patient care or safety, or conduct which

---

[13]Knox concedes that he was told within four days of publication that the plaintiff did not countersign the overdose orders. At trial, Knox attributed this error to his own mistake in reading medical records provided him by the attorney for Lehman's estate. The Globe published a correction on June 4, 1995.

is below the standards of the Professional Medical Staff or below the standards of [Dana-Farber]." In a letter to Dr. Barbara E. Bierer, dated March 31, 1995, Livingston requested that corrective action proceedings be initiated against the plaintiff based on her failure, as co-director of STAMP, chairperson of protocol 94-060, and the attending physician[14] of the two victims, to explore the possibility of an overdose, either before or after Lehman's death. A copy of the letter was sent to the plaintiff, along with a letter assuring her that the proceedings would be confidential. That same day, Livingston issued a press release disclosing the initiation of the corrective action process against two unnamed physicians. Under § 6.14 of the medical staff bylaws, the pendency and subject matter of corrective action proceedings are strictly confidential and not to be disclosed.

The next day, a third article written by Knox appeared in the Globe, entitled "Dana-Farber probe widens[,] [t]hree suspended from patient care." The article stated that, on the basis of "new evidence," Dana-Farber "yesterday initiated disciplinary proceedings against two physicians and one pharmacist involved in the chemotherapy overdose of two breast cancer patients, one of whom died." The April 1 article did not identify the plaintiff by name. She was at that time, however, the only member of the STAMP team whose identity had been revealed to the public.

On May 2, an article appeared in the Globe that did identify the plaintiff by name. The May 2 article, written by Knox and entitled "Dana-Farber tests signaled an overdose, records show," stated that, although hospital officials maintained that the "first inkling of the overdoses did not come until [two and one-half] months after Lehman's death," some specialists had indicated that laboratory test results "should have been an early tip-off of the overdoses," and suggested the possibility that Lehman could have survived if the overdoses had been discovered earlier. The article stated: "Ayash and Foran are the only physicians involved in the case who have been singled out in an internal disciplinary process launched last month by Dana-Farber."

On April 1, at the same time that corrective action proceed-

---

[14]The plaintiff disputed at trial whether she had, in fact, been attending physician, but agreed to the general accuracy of Livingston's letter.

ings against the plaintiff were initiated, Livingston notified the plaintiff that she was being assigned to "administrative duty." The plaintiff continued with the research and writing portions of her job, but was unable to see patients in a clinical setting in connection with the STAMP team. On May 10, a preliminary report documenting the grounds for corrective action against the plaintiff found that the plaintiff had been insufficiently vigilant in not checking the dosing order, but acknowledged that it had not been the common practice of care at Dana-Farber to do so, and concluded that there was "no evidence of a cover-up []or willful misconduct on [the plaintiff's] part." One finding in the report observed that "[t]here are many who think [the plaintiff], as Protocol Chairperson, should be held responsible for the events that have transpired [and] many who feel that she is the victim of scrutiny for political rather than substantial reasons." The author of the report added: "I do not subscribe to either point of view." The report stated the opinion that there was no need for further investigation or discovery and recommended a written reprimand.[15]

On June 30, Dana-Farber's clinical executive committee (committee) agreed with the findings and recommendations of the preliminary corrective action report. The committee concluded, however, that the recommended sanction should be downgraded from a written to an oral reprimand. Both the plaintiff and Livingston were sent a copy of the committee's report and given the opportunity to comment. On July 12, Livingston expressed his opinion of the report in a strongly worded letter disagreeing with the recommendation of the committee. In the letter, Livingston stated: "Given the gross lack of insight and oversight exercised by the [plaintiff] of a clinical trial in which two patients were directly harmed by massive drug overdose, I question whether an oral reprimand is sufficient Corrective Action in this case." On July 20, the plaintiff responded to Livingston's charges in a letter to Dana-Farber's president, contesting her responsibility for the overdoses and rejecting any suggestion that early discovery of their occurrence

---

[15]In early May, Livingston stepped down from his position as Dana-Farber's physician-in-chief. He was quoted as saying, "It's just the thing to do when you're the head and tragic events occur."

would have "altered the subsequent clinical course for either patient." The plaintiff did not elect to respond directly to the committee's report. In August, the conclusions of the committee were endorsed by the executive committee of Dana-Farber's board of trustees (board), which "unanimously recommended a sanction of oral reprimand." On August 8, with this final step of the corrective action proceedings completed, the plaintiff's clinical restrictions were lifted.

Because the plaintiff had been assigned to administrative duties when corrective action proceedings began, Dana-Farber was required to report the plaintiff to the Board of Registration in Medicine (board of registration). The fact that the plaintiff had been reported to the board should have remained confidential until such a time as the board issued a "statement of allegations." The board never issued such a statement but, after conducting its own investigation, issued a letter of warning to the plaintiff (which was not made public) expressing concern over the plaintiff's failure to investigate the possibility of overdoses despite strong indications of that possibility.

The Sallan committee prepared two key documents entitled (1) "Synopsis of the Conclusions and Recommendations of the Internal Peer Review Committee of the Board of Trustees of the Dana-Farber Cancer Institute" (synopsis) and (2) "Institute Actions in Response to Synopsis of the Conclusions and Recommendations of the Internal Peer Review Committee" (response). Together the documents outlined the parameters, subject matter, conclusions, recommendations, investigative process and analysis of the Sallan committee. In addition, the synopsis contained the Sallan committee's conclusions and recommendations with respect to the plaintiff. Although efforts apparently were made to limit distribution of the synopsis to appropriate people, an unidentified "confidential source" (someone who Knox considered to be a reliable source on matters pertaining to medicine) provided these documents to Knox in the spring or summer of 1995.

On October 30, when the Sallan committee's work was completed, Dana-Farber issued a press release entitled "A special report from the board of trustees and administration of the Dana-Farber Cancer Institute to its various constituencies."

The contents of the press release was a second synopsis of the Sallan committee's conclusions and recommendations that had been prepared for release to the public. The released synopsis contained no names but referred to the plaintiff as the "[p]rincipal [i]nvestigator" for the protocol.

On October 31, the contents of the synopsis of the Sallan committee report appeared in the Globe in an article, written by Knox, entitled "Dana-Farber Puts Focus on Mistakes in Overdoses." The article stated that the synopsis "noted that the doctor in charge of the team treating the two overdose victims failed to check the medical records for clues to the sudden death of one patient . . . and the cardiac collapse of a second." The article quoted a Dana-Farber physician as saying that "[s]he did not review the charts to make sure there wasn't an overdose. . . . That should have been done." The article then quoted the following language from the synopsis: "The manner in which this physician investigated the incidents contributed to the delay in detecting the overdoses." The article continued: "Dana-Farber revealed that the physician has been formally reprimanded by a Dana-Farber disciplinary panel for inadequacies in her initial review of the overdose incidents. She also was held partially responsible for ambiguities in the schema, or cover sheet, that summarized the treatment plan. It led the fellow to prescribe the four-fold overdose and fooled pharmacists who checked the medication order. Although the doctor in charge of the treatment protocol was not named by Dana-Farber, earlier reports identified her as Dr. Lois Ayash." The article named the plaintiff and Foran as the two physicians under investigation by the board of registration in medicine in connection with the overdoses. The complete Sallan committee report was never disclosed to the Globe or released to the public.

d. *Initiation of legal proceedings by the plaintiff and Dana-Farber's response.* In November, 1995, the plaintiff filed a charge with the Massachusetts Commission Against Discrimination (MCAD) alleging that Dana-Farber had discriminated against her on the basis of her gender in the terms and conditions of her employment. On February 1, 1996, the plaintiff removed her discrimination claim from the MCAD by filing her complaint in the Superior Court, asserting, among other claims,

her claim that she had been the victim of gender discrimination. The next morning, the plaintiff was called to a meeting with Sallan (who by that time had replaced Livingston as Dana-Farber's physician-in-chief), Dr. Donald W. Kufe (a STAMP team leader), and board secretary Kristen Henderson. Sallan opened the meeting by referring to the lawsuit filed the preceding day and informed the plaintiff that clinical positions which he had previously discussed with her as potential assignments were no longer available to her. Kufe informed the plaintiff that she would not be permitted to work with another STAMP team physician who earlier had indicated his willingness to work with the plaintiff. Sallan suggested that the plaintiff work at home in order to avoid awkwardness and advised her to hurry up and finish any manuscripts relating to her work with STAMP. Sallan also informed the plaintiff that he would be assigning the protocols of which she was chair, with the exception of one near completion, to another physician. The plaintiff testified at trial that "it was clear that [Sallan] knew we had filed the lawsuit."

On two earlier occasions, reference was made by the plaintiff's superiors at Dana-Farber to her lawsuit. Once, in late September of 1995 (after the plaintiff had retained counsel but before she had filed her complaint with the MCAD), Dr. Emil Frei, the principal investigator for the STAMP project grant, informed the plaintiff that she could return to the STAMP team immediately, but only on the condition that she agreed to leave within six to twelve months. According to the plaintiff, Frei repeatedly mentioned lawyers or a lawsuit in the conversation and told the plaintiff that "he would not recommend that [she] proceed with any legal action because it would hurt her." In addition, Kufe once informed her that Dana-Farber would "squash [her] like a bug."

On September 6, 1996, Dana-Farber advised the plaintiff that her employment would not be renewed as of June 30, 1997, the date that her three-year appointment was to expire. The plaintiff subsequently accepted an offer of employment in another State. On October 7, 1999, the plaintiff amended her complaint to assert an additional claim against the hospital for unlawful retaliatory discharge in violation of G. L. c. 151B, § 4 (4). We now turn to the merits of this appeal.

2. *Claims against Dana-Farber.* a. *Invasion of statutory right to privacy.* General Laws c. 214, § 1B, creates a statutory right against "unreasonable, substantial or serious" interference with a person's privacy. We have stated that, despite the disjunctive "or," the phrase "unreasonable, substantial or serious" is inclusive, as § 1B "obviously was not intended to prohibit serious or substantial interferences which are reasonable or justified." *Schlesinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 517-518 (1991). To recover under the statute for dissemination of private information,[16] a plaintiff must establish that the disclosure was both unreasonable and either substantial or serious. As recognized in the Restatement (Second) of Torts, "[e]very individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. . . . When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable [person], there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest." Restatement (Second) of Torts § 652D comment b (1977). "When the subject matter of the publicity is of public concern, . . . there is no invasion of privacy." *Boston Herald, Inc.* v. *Sharpe*, 432 Mass. 593, 612 (2000), citing Restatement (Second) of Torts, *supra* at comment d.

---

[16]Prosser discusses four types of conduct that may give rise to a claim of invasion of privacy: (1) appropriation of the plaintiff's name or likeness; (2) unreasonable intrusion upon the plaintiff's seclusion of another; (3) public disclosure of private facts about the plaintiff (even though the facts are true and no action would lie for defamation); and (4) publicity that places the plaintiff in a false light in the public eye. See W.L. Prosser & W.P. Keeton, Torts § 117, at 851-866 (5th ed. 1984). It is the third type of conduct with which the majority of our cases under G. L. c. 214, § 1B, have been concerned. But see *Schlesinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 519-520 (1991) (suggesting that intrusive conduct demonstrating pattern of harassment might be actionable); *O'Connor* v. *Police Comm'r of Boston*, 408 Mass. 324, 329-330 (1990) (recognizing that statutory privacy interest may be burdened by "warrantless, suspicionless urinalysis testing"). We have not adopted an interpretation of G. L. c. 214, § 1B, that would give rise to claim of false light invasion of privacy claim. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 787 (1989); *Fox Tree* v. *Harte-Hanks Communications, Inc.*, 398 Mass. 845, 848-849 (1986).

In determining whether there has been a violation of § 1B in the employment context, "it is necessary to balance the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure." *Gauthier* v. *Police Comm'r of Boston*, 408 Mass. 335, 338 (1990). There was no invasion of a right to privacy when a chief of police, acting in his official capacity, disclosed information about a plaintiff's fitness to be a police officer, see *Mulgrew* v. *Taunton*, 410 Mass. 631, 637 (1991), or when a police officer informed cadets of a fellow cadet's dismissal for failing a drug test, see *Gauthier* v. *Police Comm'r of Boston, supra* at 338-339. Cf. *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 306-307 & n.9 (1982). The statute, essentially, proscribes "disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest." *Bratt* v. *International Business Mach. Corp.*, 392 Mass. 508, 518 (1984).

We reject the plaintiff's assertion that release of information as to "proceedings, reports and records of a medical peer review committee" that is statutorily protected from disclosure by G. L. c. 111, §§ 203 and 204 (*a*), automatically equates to an invasion of privacy as that term is used in the context of G. L. c. 214, § 1B. General Laws c. 111, § 204, providing for confidentiality of peer review committee proceedings, was enacted to promote rigorous and candid evaluation of professional performance by a provider's peers. See *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.*, 401 Mass. 172, 182-183 (1996). The statute is designed to protect the confidentiality of physicians who participate in peer review. See *Miller* v. *Milton Hosp. & Med. Ctr.*, 54 Mass. App. Ct. 495, 501 (2002) (peer review privilege "designed to foster a candid exchange of information regarding the quality of medical care"). The words of the statute do not create a private right of action for a physician under investigation to sue for invasion of privacy when protected peer review information of the type involved here is, inadvertently or intentionally, released to the public. See *Borucki* v. *Ryan*, 407 Mass. 1009, 1009 (1990).

Despite Dana-Farber's continued denials that it (or its agents)

leaked any confidential information to Knox, the jury could
have made factual findings that Dana-Farber was responsible
for the public disclosure that peer review action was proceeding
against the plaintiff and that Dana-Farber also was responsible
for providing to Knox confidential peer review documents (the
Sallan committee's synopsis and response) that suggested some
responsibility on the plaintiff's part in connection with the
overdoses (or an alleged coverup in the aftermath of their
discovery).[17] The plaintiff, who had in no sense been a media
figure until that time, was held up to the public eye in a manner
that was exceedingly distressing to her.

Nevertheless, the disclosures were limited to the plaintiff's
professional involvement in a matter that already was the focus
of a high degree of public scrutiny and interest. This is a case
where the plaintiff (unwillingly) achieved public figure status
by reason of her status as chair and principal investigator of an
experimental research protocol under which two patients at a
prominent research institution received chemotherapy overdoses.
See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779,
786 (1989); *Jones* v. *Taibbi*, 400 Mass. 786, 801 (1987); *Peck-
ham* v. *Boston Herald, Inc.*, 48 Mass. App. Ct. 282, 289 (1999).
Accordingly, any dissemination of information regarding the
plaintiff in connection with the overdoses, including documents
that, under normal circumstances, would not be open to public
inspection, only provided further publicity on a matter that was
already squarely in the public eye. See Restatement (Second) of
Torts, *supra* at comment b ("no liability [for invasion of privacy

---

[17]The jury would be warranted in so concluding, notwithstanding the fact
that the plaintiff vigorously argued to the judge hearing her motion for sanc-
tions that without specific information from the Globe defendants as to the
identities of their confidential sources, she could not successfully demonstrate
whether officials at Dana-Farber had released confidential peer review
information to Knox. (The judge indicated his agreement with that argument
when he imposed the sanction of default judgments against the Globe
defendants.) It is far less certain whether the jury could have attributed to
Dana-Farber responsibility for leaking to the press information that the plaintiff
was under investigation by the board of registration. It is not disputed that
Dana-Farber (through Livingston as its spokesperson and physician-in-chief)
publicly did announce that corrective action proceedings against two physi-
cians had been initiated and did issue a press release summarizing, in redacted
form, the findings of the Sallan committee. The plaintiff was not, however,
identified by name in either of these public statements.

based on publicity given to true statements] when the defendant merely gives further publicity to information about the plaintiff that is already public"). We conclude that the disclosures about the plaintiff's professional conduct were part of a matter of intense public interest and were not, in any event, of an exceedingly personal or intimate nature, such as matters concerning her health or her lifestyle, to mention some examples. These considerations take the claim outside the protection of G. L. c. 214, § 1B. Although the challenged disclosures were embarrassing, the plaintiff cannot, as matter of law, establish the elements required for recovery under the statute.

b. *Breach of implied covenant of good faith and fair dealing.* Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473 (1991). This implied covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship," *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004), but rather concerns the manner of performance. It has been explained that the implied covenant exists so that the objectives of the contract may be realized. See *Crellin Technologies, Inc.* v. *Equipmentlease Corp.*, 18 F.3d 1, 10 (1st Cir. 1994). The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives. The scope of the covenant is only as broad as the contract that governs the particular relationship.

In the context of employment, employers (in varying contexts and subject to strict limitations) have been held liable for breach of the implied covenant of good faith and fair dealing only in circumstances when an at-will employee has been terminated in bad faith. See *King* v. *Driscoll*, 424 Mass. 1, 6 (1996), citing *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 104 (1977); *Maddaloni* v. *Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 881 (1982); *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 671 (1981), *S.C.*, 391 Mass. 333 (1984). There is no general duty on the part of an employer to act "nicely." Accordingly, to the extent that the plaintiff's claim rests on allegations that

Dana-Farber dealt with her in a manner that was unfair by (to mention a few examples) withholding from her an autopsy report concluding that Lehman had suffered serious heart damage as a result of the overdose, failing to correct the Globe's initial misidentification of the plaintiff as a countersigner of the overdose order, deciding not to disseminate to the public the actual outcome of the corrective action proceedings (favorable to her), or generally, in the plaintiff's words, "singling [her] out . . . for 'scapegoat' treatment," the plaintiff did not present a claim on which she could recover.

The principal thrust of the plaintiff's implied covenant claim, however, is that Dana-Farber did not follow the procedure described in its own medical staff bylaws before restricting her clinical privileges. In the specific context of a physician-hospital employment relationship, we have assumed (but not yet decided) that a physician whose staff privileges have been terminated by a hospital may assert a claim of breach of the implied covenant of good faith and fair dealing against the hospital based on its alleged bad faith failure to follow its own bylaws. See *Birbiglia* v. *St. Vincent Hosp., Inc.*, 427 Mass. 80, 84 (1998). See also *Katz* v. *Children's Hosp. Corp.*, 33 Mass. App. Ct. 574, 576 (1992) (assuming that hospital's bylaws create contractual rights in physicians). Such a claim would be premised on the hospital's breach of its promise, implicit in the employment relationship, to abide by its own bylaws in its conduct towards its physicians. See *Birbiglia* v. *St. Vincent Hosp., Inc., supra.*

Article 6 of the bylaws of the professional medical staff at Dana-Farber pertain to "corrective actions; adverse appointment and reappointment decisions; [and a physician's] rights of fair hearing." According to § 6.7 of the bylaws, a recommended corrective action that a physician's staff privileges be revoked, restricted, or modified entitles the affected physician to a panoply of rights in connection with a hearing on the matter. In circumstances (as were, apparently, present here) when a physician's clinical privileges are summarily restricted for over fourteen days in the absence of a recommendation by the corrective action committee, § 6.5 of the bylaws provides the affected physician with all of the rights provided by § 6.7, includ-

ing a hearing and written notice of the right to request a hearing.[18]

It is undisputed that the plaintiff did not receive a hearing before, or within fourteen days of, being assigned to administrative duties on March 31, 1995. Nor was the plaintiff formally notified, in writing, of her right to hearing. A copy of the bylaws was attached to the letter informing the plaintiff of the corrective action investigation against her, and the record suggests that the plaintiff was offered (and declined) the opportunity to speak before the committee deciding what, if any, corrective action was appropriate. Whether the plaintiff was entitled to request a hearing, and whether she received constructive notice and, thereafter, waived her entitlement to request a hearing, was a matter to be argued to the jury. Based on their belief in the plaintiff's version of events, and a reasonable interpretation of the bylaws, the jury reasonably could have found that Dana-Farber had violated its own bylaws and, in doing so, violated the implied covenant of good faith and fair dealing in its employment contract with the plaintiff.

---

[18]Section 6.14 of the bylaws provides that the "proceedings, reports, records, findings, recommendations, evaluations, opinions, deliberations or other actions taken pursuant to this [art. 6], and the identity of and information provided by witnesses or any other individuals, shall be treated as confidential to the extent permitted by law and public regulations." The plaintiff's counsel argued at trial, in vague fashion ("All the conduct that I described earlier in connection with sex discrimination and retaliation also constitutes violation of that covenant"), that Dana-Farber violated the implied covenant of good faith and fair dealing in its employment relationship when it, through Livingston or another high ranking hospital official, released to the Globe internal peer review and other confidential information regarding the plaintiff, including information that corrective action proceedings had been initiated against her and that she had been reported to the board of registration. In her reply brief, the plaintiff claims that the implied covenant was violated when Livingston "disclosed to the Globe the [c]orrective [a]ction proceedings concerning [the plaintiff] and said that the possibility of a cover-up (for which there was no evidence) was 'right smack in the bull's eye' of the internal investigation." We postpone comment on the assumption, underlying the latter claim, that it was Livingston who secretly informed Knox of the plaintiff's identity in connection with the corrective action proceedings. See note 29, *infra*. To date, the plaintiff has not argued the precise point that alleged improper disclosures on the part of Dana-Farber violated § 6.14 of its bylaws and, thereby, constituted a breach of the implied covenant. Any claim to that effect, therefore, is waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also *Foley* v. *Sun Publ. Co.*, 404 Mass. 9, 11 (1989).

Thus, we assume that Dana-Farber violated the implied covenant of good faith and fair dealing when it restricted the plaintiff's clinical privileges without first notifying her of her right to request a hearing. We conclude, nevertheless, that the judgment entered against Dana-Farber must be vacated, because the plaintiff has offered no evidence that she suffered compensable loss as a result of the breach. As has been stated, the plaintiff's clinical privileges, restricted in April, 1995, were fully restored in August of that year, after the committee concluded that an oral reprimand was the appropriate action to take. Our cases establish that, in awarding damages for breach of the implied covenant of good faith and fair dealing, the goal is to compensate an employee for past services and to deny the employer "any readily definable, financial windfall" resulting from the breach. *McCone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 234 (1984), quoting *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 335. See *King* v. *Driscoll*, *supra* at 5; *Maddaloni* v. *Western Mass. Bus Lines, Inc.*, *supra*; *Fortune* v. *National Cash Register Co.*, *supra*. Consistent with this principle, and keeping in mind that the plaintiff received all sums due her for her employment, Dana-Farber is liable neither for negative effects on the plaintiff's future career nor for the plaintiff's emotional distress. The only damages to which the plaintiff is entitled are for economic losses suffered as a result of the hospital's failure to provide written notice of her right to a hearing. Because the plaintiff has made no specific showing of such a loss, her allegations fall short of proving a claim.

c. *Retaliation in violation of G. L. c. 151B, § 4 (4)*. Based on the facts set forth in part 1.d of this opinion, a reasonable jury could conclude that Dana-Farber's decision not to renew the plaintiff's appointment was motivated by retaliatory animus fueled by the plaintiff's filing of a lawsuit against Dana-Farber alleging discrimination based on gender.[19] The plaintiff had been forewarned by a STAMP team leader, as early as

[19] We reject Dana-Farber's contention that it is entitled to judgment in its favor because of the plaintiff's failure to file her claim of unlawful retaliation with the MCAD. As is stated above, the plaintiff already had removed her discrimination claim to the Superior Court by the time she was notified that her reappointment would not be forthcoming. She subsequently amended her complaint to add the charge of retaliation. In these circumstances, she was not

September, 1995, that proceeding with any legal action would "hurt her." A second STAMP team leader subsequently informed her that Dana-Farber would "squash [her] like a bug." Significantly, the day after the plaintiff removed her administrative complaint of discrimination to the Superior Court, she was told that clinical positions previously available for the upcoming fall were no longer available and, indeed, that no clinical positions would be available for the plaintiff. Suggestions that she should work at home and that she should complete her unfinished STAMP work could be, in the eyes of the jury, indicators of Dana-Farber's intention to punish the plaintiff for asserting her rights under G. L. c. 151B. Although the plaintiff continued to work at Dana-Farber for many months after this meeting, the message, that her employment future at the hospital was in jeopardy, had been conveyed.

At trial, Dana-Farber characterized the decision to eliminate the plaintiff's position as one part of the hospital's cost-cutting reductions that included many people who had not engaged in protected activities under G. L. c. 151B, made in response to significant reductions in funding, including the loss of research funding for protocol 94-060. The record demonstrates that, of all the hospital employees let go as part of the hospital's "cost-cutting reductions," only one other employee was at the plaintiff's level, and the plaintiff was the only member of the STAMP team whose appointment was not renewed. Dana-Farber's contention that the plaintiff "did not suffer any adverse employment action in connection with the alleged retaliation" simply is not persuasive. Clearly, the jury felt so as well. The plaintiff's evidence easily meets the standard for proof of causation in retaliation claims under G. L. c. 151B. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 114 (2000); *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 168 (1987); *Carter* v. *Commissioner of Correction*, 43 Mass. App. Ct. 212, 224 (1997).

d. *Charitable cap.* The plaintiff claims error in the judge's

required to return to the MCAD to file a second complaint. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 529 n.8 (2001), and cases cited.

application of the statutory cap under G. L. c. 231, § 85K, limiting the tort liability of a charitable entity at $20,000, to Dana-Farber's liability.

The question whether unlawful retaliatory conduct in the employment context falls within the scope of § 85 to shield charitable institutions from the full effects of liability under G. L. c. 151B has never been addressed by this court. In *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 27-28, cert. denied, 522 U.S. 1015 (1997), we held that § 85K does not apply to damages awarded under G. L. c. 93A because that statute created "broad new rights, forbidding conduct not previously unlawful under the common law of contract and tort or under any prior statute." We used the same reasoning in *Birbiglia* v. *Saint Vincent Hosp., Inc.*, 427 Mass. 80, 88 (1998), to hold that § 85K did not apply to a claim that a hospital violated G. L. c. 272, § 99 Q, the Massachusetts wiretapping statute. The United States Court of Appeals for the First Circuit has held that § 85K does not limit damages awarded under G. L. c. 151B. See *McMillan* v. *Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 307 (1st Cir. 1998), cert. denied, 525 U.S. 1104 (1999). Following the reasoning of the *Linkage* case, the First Circuit concluded that G. L. c. 151B, like G. L. c. 93A, created rights that did not exist under the common law and, thus, claims under G. L. c. 151B were not to be considered "torts" for purposes of § 85K. See *id.* We agree and now hold that § 85K does not apply to limit damages awarded pursuant to a successful claim of unlawful retaliation under G. L. c. 151B.[20]

Our holding finds substantial support in the legislative history, as well as the plain language, of both statutes. Up until the

---

[20]Our position is consistent with our interpretation of G. L. c. 258, § 2, the Massachusetts Tort Claims Act (Act), limiting liability of public employers for a "negligent or wrongful act or omission of any public employee acting within the scope of his office of employment" to $100,000. See *Jancey* v. *School Comm. of Everett*, 421 Mass. 482, 501 (1995), *S.C.*, 427 Mass. 603 (1998). In *Jancey*, this court held that the Act does not apply to an employee's wage discrimination claim because "even though wage discrimination 'has historical connections to common law tort and contract claims,' *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 226 (1994), acts of discrimination — whether intentional or unintentional — do not thereby become torts." *Id.*, citing *Whitney* v. *Worcester*, 373 Mass. 208, 216 n.10 (1977) ("The inquiry into

time that G. L. c. 231, § 85K, was enacted in 1971, a nonprofit hospital, such as Dana-Farber, enjoyed charitable immunity from tort liability. The statute abolished the defense of charitable immunity to "any cause of action based on tort" brought against a charitable corporation, but imposed a mandatory $20,000 limit on liability "if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation." The purpose behind the charitable cap was "to protect the funds [and other assets] of charitable institutions so they may be devoted to charitable purposes." *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 429 (1989), cert. denied, 493 U.S. 1056 (1990). We have enforced the cap as a "legislatively mandated limit on the amount of civil damages that can be recovered from a charitable corporation that causes harm by committing a tort in the performance of its charitable purpose, no matter how compelling the circumstances of the injured party." *Keene* v. *Brigham & Women's Hosp., Inc.*, 439 Mass. 223, 239 (2003). The plain language of the statute, however, could not be clearer. Section 85K applies only in limited circumstances where damages flow from a tort "committed in the course of any activity carried on to accomplish directly [a defendant's] charitable purposes." The charitable cap does not apply to most statutory violations, unless there is a "tort" within the meaning of the statute.[21]

We have, admittedly, referred frequently to tort-like aspects of claims of discrimination under G. L. c. 151B. See, e.g., *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 559-560, cert. denied, 125 S. Ct. 481 (2004); *Thomas* v. *EDI Specialists, Inc.*, 437 Mass. 536, 539 (2002); *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 223 (1994); *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 387 (1988). It cannot be said, however, that claims arising under G. L. c. 151B are causes of action in tort. Chapter 151B is a comprehensive statute enacted to provide judicial and administrative remedies

governmental tort liability in a particular case must begin with a determination whether the conduct in question was in fact tortious").

[21]Because we conclude that a violation of G. L. c. 151B is not a tort for purposes of G. L. c. 231, § 85K, we need not consider the statute's requirement that the tortious conduct complained of be committed within the scope of a defendant corporation's charitable purpose.

for destructive acts of discrimination in the workplace. When the statute was originally enacted, the Legislature specifically exempted charitable organizations from the category of "employers" who could be liable for G. L. c. 151B violations. The remedies provision contained in § 9 expressly states that it should be "construed liberally for the accomplishment of" the purposes of G. L. c. 151B and that "any law inconsistent with any provision [of G. L. c. 151B] shall not apply." In 1969, the Legislature removed G. L. c. 151B's charitable exemption and made charitable organizations "employers" subject to the same provisions and remedies as other employers for claims brought under that chapter. G. L. c. 151B, § 1 (5), inserted by St. 1969, c. 216. Section 4 (4) of G. L. c. 151B, thus, made it unlawful for a hospital employer, such as Dana-Farber, to "discharge, expel or otherwise discriminate against any person" because that person filed a complaint with the MCAD, two years before G. L. c. 231, § 85K, abolished charitable immunity as to causes of action "based on tort" but imposed the charitable cap on recovery "if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of the corporation." A fair reading of both statutes does not support the extension of the charitable cap to damages awarded for successful claims under G. L. c. 151B.[22]

e. *Damages as a whole.* This conclusion, coupled with our determinations, set forth in parts 2.a and 2.b of this opinion, that the verdicts against Dana-Farber for invasion of privacy and violation of the implied covenant must be vacated, leads us inevitably to conclude that there must be a new trial on damages to be assessed against Dana-Farber on the retaliation claim. The jury returned a special verdict as to each count, but despite requests by Dana-Farber, the jury was not asked to assess damages separately for each claim. The judge repeatedly instructed the jury that damages could not be duplicative (that caution was written on the verdict slip as well). In a written order on post-trial motions, however, the judge observed that "at all times it was assumed that the damages for all three causes of action [against Dana-Farber] were the same and that the claims were

---

[22]The question is not one, as argued by Dana-Farber, that may be addressed on a case-by-case basis.

simply alternative forms of pleading based on the same set of facts." The plaintiff appears to concede the truth of the judge's observation. On this record it is impossible to ascertain the amount of damages the jury assessed for the retaliation claim.[23] In such a situation, with the damages on three claims (two of which are invalid, one of which is sound) awarded in an undifferentiated lump sum, there must be a new trial on damages.

3. *Claim against Livingston.* The jury found in the plaintiff's favor on her claim that Livingston wrongfully induced Dana-Farber not to extend her employment relationship. The plaintiff asserts that it was Livingston alone who conducted his own investigation into the overdose without asking the plaintiff her version of events or whether she had checked the chemotherapy dose administered to Lehman; failed to correct Knox's misidentification of the plaintiff as a countersigner of the overdose orders and confirmed to Knox that Dana-Farber was investigating a possible cover-up; initiated a corrective action investigation of the plaintiff's performance, but failed to notify her of the matter until after he had issued a press release on the subject; summarily assigned the plaintiff to research and administrative duties during the investigation; and sent a strongly worded letter to the committee, expressing his view that an oral reprimand of the plaintiff was insufficient. Livingston argues that the judgment entered against him is contrary to law. He asserts that, as Dana-Farber's physician-in-chief, he did "exactly what he should have done" and, moreover, would have been "seriously remiss" if he had failed to seek a peer review investigation of the plaintiff's performance and voice his opinion that an oral reprimand was insufficient. According to Livingston, "[i]t is a travesty of justice for [him] to be held liable because he did not shy away from his professional obligation to seek a peer review

[23]At the time of the filing of her original complaint, the plaintiff already claimed that she had suffered damages as a result of the alleged invasion of privacy and breach of the covenant of good faith and fair dealing on the part of Dana-Farber. The retaliation claim, and any damages resulting from that retaliation, necessarily relate only to discrete events that occurred at the end of the sequence of events outlined at trial. The total damages awarded comprised damages flowing from the entire scenario, and lacking any itemization from the jury, it is impossible to identify how much of that total is attributable to the acts of retaliation.

investigation of the plaintiff's failure to check for the possibility of overdoses."

We first address the threshold question of Livingston's immunity under State law.[24] General Laws c. 111, § 203 (*a*), directs that the bylaws of every licensed or public hospital, and the bylaws of all medical staffs, contain procedures whereby allegedly incompetent conduct that could be harmful to patient care shall be reported, investigated, reviewed, and resolved. Section 203 (*c*), in turn, provides that an individual or institution providing information, opinion, counsel or services to, or participating in, a medical peer review committee "shall not be liable in a suit for damages by reason of having furnished such information, opinion, counsel or services or by reason of such participation." The statutory protection, however, only extends to individuals who "acted in good faith and with a reasonable belief that said actions were warranted in connection with or in furtherance of the function of said committee or the procedures required by this section." G. L. c. 111, § 203 (*c*). The statute, thus, protects a physician who, in good faith, provides information or an opinion against someone else in the professional context of peer review proceedings from thereafter being held liable in tort based on that participation. It follows that the medical peer review privilege does not extend to physicians who participate in bad faith.

It is precisely allegations of Livingston's bad faith that are at the heart of the plaintiff's intentional interference claim. As the judge instructed the jury, the specific elements that must be proved in order to establish a claim of intentional interference with an employment relationship are (1) an advantageous employment relationship; (2) the defendant's knowledge of such relationship; (3) that the defendant's interference, in addition to being intentional, was improper in motive or means; and

---

[24]We decline to address Livingston's parallel claim of immunity under the so-called Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101 et seq. (1994), made in his brief, because we deem it waived. Although Livingston did cite the HCQIA in an earlier memorandum in this case submitted, jointly with Dana-Farber, in connection with a motion for a protective order, the citation was offered in an entirely different context, namely, in support of an argument that the protection afforded to peer review documents under the HCQIA had not heretofore been waived.

(4) that the plaintiff suffered economic harm as a result of the defendant's conduct. See *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992), citing *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991); *Comey* v. *Hill*, 387 Mass. 11, 19 (1982).

We focus on the requirement that the intentional interference be "improper in motive or means." We have observed with respect to this requirement that the propriety of an actor's motives, or conduct, in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis. See *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, *supra* at 273. In addressing the issue of an employee claiming that a supervisor intentionally interfered with the employee's advantageous relationship with the employer, we stated that an employee's supervisor is "privileged to act as he did unless he acted out of malevolence, that is, with 'actual' malice." See *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993), quoting *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 (1981). In *Wright* v. *Shriners Hosp. for Crippled Children*, *supra*, a hospital's assistant director of nursing was fired, ostensibly in retaliation for having pointed out, to a visiting survey team, certain problems at the hospital relating to communication and patient care. We held in *Wright* that the hospital administrator had a right to fire the plaintiff unless he did so "malevolently, i.e., for a spiteful malignant purpose unrelated to the legitimate corporate interest." *Id.* at 476, quoting *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-433 (1987).[25]

We need not decide whether the evidence presented by the plaintiff at trial, reviewed under the proper standard, see *Boothby* v. *Texon, Inc.*, *supra* at 470, was sufficient to support a finding that Livingston's challenged conduct was malevolent, or that he

[25]As the alleged events underlying the plaintiff's claim unfolded, Livingston resigned as Dana-Farber's physician-in-chief. See note 15, *supra*. Livingston arguably would no longer have been deemed the plaintiff's superior at the hospital, for example, at the time he wrote his July 12, 1995, letter regarding the recommendation of the committee. We discount any suggestion that the change in Livingston's employment position at Dana-Farber is relevant to our resolution of the claim.

acted out of spiteful malignant purpose.[26] Livingston argues that the verdict against him was tainted by the improper admission in evidence of confidential peer review documents. We agree.

We have discussed the statutory mandate set forth in G. L. c. 111, § 203 (a), that bylaws of hospitals and their medical staffs contain procedures for medical peer review proceedings, and the provisions of immunity from tort liability set forth in § 203 (c) for those who participate in such proceedings in good faith. Subsequent sections of G. L. c. 111 address a related aspect of medical peer review proceedings, namely, the treatment of documents and records generated in the medical peer review context. Section 204 (a) directs that proceedings, records, and findings of medical peer review committees "shall be confidential and . . . shall not be subject to subpoena or discovery, or introduced into evidence" and "no person who was in attendance at a meeting of a medical peer review committee shall be permitted or required to testify in any . . . judicial or administrative proceeding [except those of the boards of registration, social work, or psychology]."[27] "The medical profession has historically regulated itself through internal hospital disciplinary proceedings designed to identify and remedy instances of substandard care." *Carr* v. *Howard,* 426 Mass. 514, 517 (1998). In 1986, the Legislature enacted G. L. c. 111, §§ 203 and 204, St. 1986, c. 351, § 9, to bolster the effectiveness of medical peer review by providing a "measure of confidentiality to the work of medical peer review committees." *Id.* at 518. See *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.,* 401 Mass. 172, 182-183 (1987) (statutory privilege of confidentiality "designed to foster aggressive critiquing of medical care"). Physicians would be far less willing candidly to report, testify about, and investigate concerns of patient safety if their actions would be subject to later scrutiny and possible litigation.

---

[26]Evidence warranting such a finding would, presumably, also suffice to satisfy the bad faith exception to the statutory immunity for any expressions of opinion or conduct on Livingston's part that fell within the scope of G. L. c. 111, § 203 (c).

[27]General Laws c. 111, § 204 (b) and (c), define circumstances under, and the extent to, which peer review documents may be disclosed and peer review committee witnesses and members may be questioned concerning peer review activities. None are present here.

At every stage of the case, Dana-Farber and Livingston sought unsuccessfully to protect the confidentiality of peer review proceedings that gave rise to the plaintiff's claims. First, Dana-Farber and Livingston filed an emergency motion to impound the case file. Their motion was denied by a judge, and the denial was affirmed by a single justice of the Appeals Court. Next, Dana-Farber and Livingston moved for a protective order to bar discovery of confidential medical peer review proceedings, reports, and other hospital records. That motion was denied, by the same judge, without prejudice, and the denial was affirmed by a single justice of the Appeals Court. Dana-Farber and Livingston filed a petition for relief from the judge's denial of their motion, pursuant to G. L. c. 211, § 3, with a single justice of this court, who declined to intervene. On its renewal later in the case, the motion for a protective order again was denied, this time on the grounds that Dana-Farber had waived the confidentiality provisions of G. L. c. 111, § 204, when it shared the documents with the plaintiff.[28]

The plaintiff's claim of intentional interference against Livingston centered on the role he played in the corrective action proceedings. This role was memorialized in two letters written by Livingston: (1) his March 31, 1995, letter requesting that corrective action proceedings be initiated against the plaintiff in order to "evaluate [the plaintiff's] clinical competence, judgment and sense of responsibility to her patients and colleagues"; and (2) his subsequent letter, dated July 12, 1995, regarding the

---

[28]This determination was incorrect. That Dana-Farber chose to share certain peer review documents with the plaintiff cannot constitute a waiver of the statutory bar against their use at trial against Livingston. See *Miller* v. *Milton Hosp. & Med. Ctr., Inc.*, 54 Mass. App. Ct. 495, 501 (2002). "The peer review privilege does not rest on its threshold confidentiality as between the parties to the litigation [as does, for example, the attorney-client privilege], but instead is designed to foster a candid exchange of information regarding the quality of medical care." *Id.* See *Commonwealth* v. *Choate-Symmes Health Servs.*, 406 Mass. 27, 28-29 (1989) (narrowly construing exception to statutory language barring procurement of peer review committee records for use in judicial or administrative proceedings). In our view, applying waiver principles to peer review communications would significantly undermine the effectiveness of the statute. Physicians could hardly be expected to volunteer information, or express honest opinions, if the confidentiality of their comments could be waived after the peer review process were completed and, as here, their participation used as evidence in a lawsuit against them.

recommendation of the committee, in which he expressed his view that an oral reprimand was an insufficient response for the plaintiff's "gross lack of insight and oversight." Dana-Farber and Livingston moved to bar the plaintiff from introducing all documents in connection with the corrective action proceedings at trial. Deferring to the prior rulings of the motion judge, the trial judge denied this motion. During the trial, both letters were admitted in evidence over Dana-Farber's and Livingston's continuing objections.

As conceded by the plaintiff, in her original complaint and again in her amended complaint, both the corrective action proceedings and the Sallan committee proceedings were confidential peer review proceedings protected by G. L. c. 111, § 204. It follows that the "proceedings, reports and records" of both committees fell within § 204 (a)'s protection from "subpoena or discovery, or introduc[tion] into evidence." The scope of the language "proceedings, reports and records" is defined expansively in G. L. c. 111, § 205 (b), which provides that "[i]nformation and records . . . which are necessary to the work product of medical peer review committees . . . shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of [§ 204]."

We reject the plaintiff's contention that Livingston's July 12 letter regarding the recommendation of the committee fell outside of the scope of the corrective action proceeding and, thus, does not constitute privileged peer review. As has been stated, art. 6 of Dana-Farber's medical staff bylaws set forth the procedures for corrective action, or medical peer review, proceedings. Section 6.4.4 of the bylaws expressly provides that the initiator of a request for corrective action (here, Livingston) is entitled to respond, in writing, to a recommendation by the committee of a corrective action that does not require a hearing (as here, when the committee recommended only an oral reprimand), and the board, in its discretion, may consider any new or additional information provided in such a response. We conclude that the letter containing the initiator's response to the committee's preliminary recommendation, as well as the actual letter initiating the peer review proceedings, both were submitted as part of the peer review process provided for in Dana-

Farber's medical staff bylaws, and are the type of documents that are "necessary to the work product of medical peer review committees." *Carr* v. *Howard, supra* at 531 (applicability of § 204 to particular documents may be determined from purpose and process from which it emerged). The admission of the letters was error.

Without the letters, the plaintiff's evidence against Livingston generally concerned his failure to inquire into the plaintiff's version of events in the days following the discovery of the overdoses; his decision to assign the plaintiff to "administrative duty," thereby suspending her clinical privileges, and thereby causing her to be reported to the board of registration; and his failure to support the plaintiff when she was publicly maligned in the Globe.[29] That evidence may have warranted findings that Livingston's attention was inordinately focused on the plaintiff's culpability. It clearly would not have warranted, however, an inference that the misplaced focus was deliberate or motivated by a "spiteful, malignant purpose" to hurt the plaintiff that was unrelated to his professional responsibilities. His apparent motive was to seek out any perceived wrongdoers. See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 817 (1990). We conclude that the plaintiff's allegations of Livingston's bad faith cannot support a jury finding against him under the standard stated in *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992). See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 664 (1981), *S.C.*, 391 Mass. 333 (1984) ("The line between a proper inference and unwarranted conjecture is not easily drawn. The answer depends on the evidence in each case and on what the trier of fact may reasonably infer from that evidence").

4. *Counts against the Globe defendants.* As was explained at the outset of this opinion, during the discovery stage of the

---

[29]The plaintiff alleges that Livingston may have been Knox's "confidential source" at Dana-Farber who had supplied her name in connection with the announced corrective action proceedings, or who had passed Knox a copy of the hospital's highly confidential Sallan committee synopsis. The plaintiff also suggests that Livingston may have secretly provided to the board of registration a copy of his July 12 letter responding to the committee's corrective action recommendations. These allegations are without support in the record and far too speculative to form a basis for a finding of improper motive.

litigation, the plaintiff sought to compel the Globe defendants to reveal the identities of sources consulted before publishing the series of articles that formed, in large part, the basis of the plaintiff's libel and privacy claims against Dana-Farber and the Globe defendants. Specifically, the plaintiff sought the identities of Knox's sources who disclosed (1) that the plaintiff was the subject of a Dana-Farber internal "corrective action" investigation; (2) that the plaintiff was the subject of an investigation by the board; and (3) information contained in the synopsis of the Sallan committee and Dana-Farber's response. The plaintiff also sought the identity of the person, or persons, who informed Knox of his mistake in naming the plaintiff as a countersigner of the overdose orders. The judge concluded that the identities of Knox's confidential sources were central to the plaintiff's libel claims against the Globe defendants and against Dana-Farber and her intentional infliction of emotional distress claims against Knox. Accordingly, the judge denied the Globe defendants' motion for a protective order and granted the plaintiff's motion to compel.[30] On the Globe defendants' refusal to comply with the discovery order, the judge entered a judgment of civil contempt against the Globe defendants and imposed, as a monetary sanction, a series of escalating fines.

The Appeals Court vacated the judgment and remanded the case to the Superior Court for findings and conclusions that would justify the entry of sanctions.[31] See *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. 384, 392-393 (1999). On remand, the plaintiff renewed her motion to compel the disclosure of confidential sources. One confidential source (a physician who had alerted Knox to his misidentification of the plaintiff as the overdose order countersigner) had by this time come forward, and the plaintiff no longer needed to know that person's identity in order to pursue her libel claims. The plaintiff argued, however, that the identities of other confidential sources were necessary in order to pursue her claims against Knox for

[30]The Globe defendants petitioned for interlocutory relief of the disclosure order, pursuant to G. L. c. 231, § 118, first par., from a single justice of the Appeals Court, who denied the petition.

[31]By the time the Appeals Court heard the case, the Globe defendants had been granted partial summary judgment on the plaintiff's privacy claim against them.

intentional infliction of emotional distress and against Dana-Farber for invasion of privacy and for breach of the implied covenant of good faith and fair dealing. The judge (the same who had issued the vacated orders) performed the appropriate balancing test and determined that the plaintiff's need for the information in order to pursue her claims against Knox and Dana-Farber was "tangible and substantial and outweigh[ed] the public interest in protecting the free flow of information." See *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. 581, 586-587, cert. denied, 488 U.S. 980 (1988). Accordingly, the judge granted the plaintiff's renewed motion to compel the Globe defendants to disclose the identifies of their confidential sources. An order to disclose was entered on October 21, 1999. When the Globe defendants continued to refuse to reveal the purported "confidential sources," or any information which would lead to their identities, the plaintiff filed a motion to compel Knox to answer one interrogatory. The judge allowed the motion and ordered Knox to answer the interrogatory, by or before June 10, 2000. This second order was entered on June 13, 2000. Knox (together with his Globe editor) still refused to reveal his sources.

The plaintiff filed a motion for the imposition of sanctions pursuant to Mass. R. Civ. P. 37 (b) (2), as amended, 390 Mass. 1208 (1984). The judge allowed the plaintiff's motion and ordered, as a sanction pursuant to rule 37 (b) (2), that judgments of liability enter in favor of the plaintiff on all of her remaining claims against the Globe defendants.[32]

a. *Merits of the sanction.* We review the imposition of sanctions under the well-established abuse of discretion standard. See *Keene* v. *Brigham & Women's Hosp., Inc.*, 439 Mass. 223, 235 (2003); *Roxse Homes Ltd. Partnership* v. *Roxse Homes, Inc.*, 399 Mass. 401, 404 (1987); *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 441 (1980).

In his written memorandum and order, the judge found that

---

[32]The judge also ordered, as a sanction pursuant to Mass. R. Civ. P. 37 (b) (2), as amended, 390 Mass. 1208 (1984), that the Globe defendants pay reasonable attorney's fees and costs incurred by the plaintiff because of the Globe defendants' failure to comply with the October 21, 1999, and the June 13, 2000, orders.

the Globe defendants' ongoing refusal to comply with the October 21, 1999, and June 13, 2000, discovery orders constituted a contempt, as well as a violation of the court's orders, and that the Globe defendants' conduct fell within the scope of rule 37 (b) (2). The judge reasoned that the earlier order of contempt and imposition of monetary sanctions had not succeeded in securing the Globe defendants' compliance with the discovery orders and, as a result, the alternate authorized sanction of default judgment was warranted. The judge noted that the noncompliance of the Globe defendants had inflicted an "injustice" on the plaintiff's right to discovery in her case against Dana-Farber and Livingston. The judge stated his view that the imposition of a default judgment, by itself, would not adequately serve "[t]he interests of justice" because the Globe defendants' refusal to disclose may also "effectively protect [Dana-Farber] and . . . Livingston from liability in this action," thus constituting an "ongoing, but imminently avoidable, harm" to the plaintiff. The judge characterized the Globe's conduct as a "unilateral[] and unnecessar[y] interupt[ion to] the free flow of information that may be critical to [the plaintiff.] It is ironic that the Globe defendants' conduct may serve to effectuate the interests of the very hospital, as well as the hospital's former chief executive, where the Boston Globe's own reporter was treated and died. It is not a legacy of which the Globe defendants should be proud." The judge's order was within his discretion.

At the time of the judge's ruling, the overdose incidents had occurred over six years previously. There is nothing in the record to suggest that Knox continued to receive or collect information pertaining to the overdoses from these sources that would justify the continued concealment of their identities. The judge concluded that their identities, and information that they potentially could reveal, bore directly on the plaintiff's claims against Knox and Dana-Farber. Given the current posture of the case, including the jury's verdict in favor of Dana-Farber and Livingston on the libel claim and our conclusions that the plaintiff's evidence did not support claims against Dana-Farber for invasion of privacy, see part 2.a and note 17, *supra*, or against Livingston for intentional interference, see part 3, *supra*,

it might be tempting to take issue with the judge's apparent view of the strength of the plaintiff's need to know the identities of Knox's sources and, with the clarity granted by hindsight, express our opinion that the identities of any confidential sources were, in the end, peripheral at best to the plaintiff's case. We decline to do so.

At the heart of the plaintiff's case were her intertwined assertions that officials at Dana-Farber were intentionally "scapegoating" the plaintiff, at the same time that the Globe and Knox were intentionally "spotlighting" her for public censure. The plaintiff had the right to know whether it had been an agent of Dana-Farber (or, possibly, Livingston himself) who had divulged confidential information to the Globe, as well as the full extent of connections between Knox and officials at Dana-Farber. As a result of the Globe defendants' refusals to comply with the discovery orders, the plaintiff lost her opportunity to proceed against the defendants on a theory of joint and several liability. Knowledge of who (if anyone) at Dana-Farber had spoken to Knox, and exactly what had been said, could have allowed the plaintiff to bolster her asserted claims or to add new ones.

Over a period of years, the judge had ordered the Globe defendants to comply with the plaintiff's requests for discovery of this information, to no avail. The Globe defendants made a deliberate choice to protect Knox's sources and to forgo their (potentially meritorious) defenses to the claims asserted against them rather than obey the judge's orders.[33] The judge was not trying to punish the Globe defendants. He clearly felt that he

---

[33]This is clearly not a case where the Globe defendants were unable to comply with the orders. We do not suggest that their refusals to obey the discovery orders were in bad faith. Despite their assertions to the contrary, however, the Globe defendants had no special constitutional or statutory testimonial privilege, based on their status as a newspaper publisher or reporter, that would justify their refusal to obey the orders. See *In the Matter of John Doe Grand Jury Investigation*, 410 Mass. 596, 598 (1991) (*Doe*); *In the Matter of Roche*, 381 Mass. 624, 636, citing *Herbert* v. *Lando*, 441 U.S. 153, 180 (1979) (Powell, J., concurring). We have recognized that values underlying the First Amendment to the United States Constitution and art. 16 of the Amendments to the Massachusetts Constitution may give rise to a common-law privilege that would allow a news reporter to refuse to reveal his sources. See *Petition for the Promulgation of Rules Regarding the Protection of Confidential News Sources & Other Unpublished Information*, 395 Mass. 164, 172 (1985) (*Petition*). In deference to the effect that compelled discovery

had no alternative method of enabling the plaintiff to obtain the information she needed, and he left open to the Globe the option to remove the default by complying. The question for our review is whether the judge's order constituted an abuse of the "broad measure of discretion" afforded him. See *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. 581, 585, cert. denied, 488 U.S. 980 (1988). We conclude that it did not.[34]

b. *Damages against Globe defendants.* The only issue for the jury at trial with respect to the Globe defendants was what amount of damages, if any, the conduct for which they were held liable caused to the plaintiff. We are aware of the general rule that a reviewing court should not disturb a jury's award of damages unless it is clearly excessive in relation to what the plaintiff's evidence has demonstrated damages to be. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 824 (1997); *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989); *Bartley* v. *Phillips*, 317 Mass. 35, 40-41 (1944). We are also aware that appellate judges have a special duty in reviewing verdicts in defamation cases, "[b]ecause of constitutional considerations, and the potential difficulties in assessing fair compensation." *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 861 (1975). A plaintiff in a successful defamation case is entitled only to fair compensation for actual damages, including emotional distress and harm to reputation (and any special damages that have been pleaded

has on free speech, and to avoid the "needless disclosure of confidential relationships," *In the Matter of Roche, supra* at 637, our cases require a judge ruling on discovery requests, on a showing that "the asserted damage to the free flow of information is more than speculative or theoretical," to conduct a balancing test between "the public interest in every person's evidence and the public interest in protecting the free flow of information." *Petition* at 172. See *Doe, supra; Sinnott* v. *Boston Retirement Bd.*, 402 Mass. 581, 586, cert. denied, 488 U.S. 980 (1988). As has been stated above, the judge carefully performed that balancing test and properly concluded that, in this case, the plaintiff's need for the requested information outweighed the public interest in the protection of the free flow of information to the press.

[34]The first disclosure order was entered in October, 1999. In November, 1999, the Globe defendants filed motions for summary judgment seeking dismissal of the plaintiff's remaining claims against them. The second disclosure order was entered in June, 2000. The judge did not err in failing to address the pending summary judgment motions before resolving the discovery issues. The plaintiff was entitled to adequate discovery before litigating the summary judgment motions.

and proved). See *Tosti* v. *Ayik*, 394 Mass. 482, 496 (1985), *S.C.*, 400 Mass. 224, cert. denied sub nom. *United Auto Workers, Local 422* v. *Tosti*, 484 U.S. 964 (1987).

The theme of the plaintiff's case was that the Globe defendants "improperly spotlighted" her and that Dana-Farber and Livingston (the medical defendants) "improperly scapegoated" her. In her memorandum and order on the posttrial motions of the parties, the judge summarized the plaintiff's theory with respect to damages against all defendants as "the defendants' actions that caused damage to the plaintiff, although based on different and separate legal theories, operat[ing] on . . . parallel course[s]." We agree with this assessment. As has been stated, the jury determined that joint and several liability was not applicable. Of the total damages awarded the plaintiff, the jury awarded $2,100,000 against the Globe defendants and $2,100,000 against the medical defendants. Against each set of defendants, the jury's total award reflected identical sums for economic damages ($300,000) and for emotional distress damages ($1,800,000). It appears that the precisely equivalent apportionment of damages between the medical defendants and the Globe defendants was deliberate.[35] There is no indication, however, that the controlling damages principles were not correctly applied. Further, unlike the claims against Dana-Farber, the Globe defendants, by reason of the default judgment, were liable on all claims made by the plaintiff and the damages flowing from their wrongdoing. The issue present in the assessment of damages against Dana-Farber, therefore, is not present in the case against the Globe defendants.

The judge's general instructions to the jury on damages (which drew no objection that is relevant here) clearly explained that compensatory damages must be calculated to compensate the plaintiff for her losses, based with reasonable certainty on the evidence, only for harm caused by the wrongful conduct,

---

[35]It is likely that the jury decided on a total monetary figure necessary fairly to compensate the plaintiff for injuries caused by the defendants' combined actions. Then, based on their conclusion that the medical defendants and the Globe defendants were equally to blame (although not jointly liable), the jury could have apportioned damages for economic loss and emotional distress damages in precisely equivalent amounts between the two sets of defendants.

and that damages may not be duplicative. The judge cautioned the jury that damages must be attributed to the defendant who inflicted them and instructed the jury on joint and severable liability. We must presume that the jury assessed damages, separately but in equal measure, against the medical defendants and the Globe defendants in accordance with the judge's instructions. See *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 870 (1993).

Although the damages awarded the plaintiff for the defaulted claims against the Globe defendants may appear high, they were based on evidence that the Globe articles impugning the plaintiff affected her career[36] and caused her a great deal of emotional and psychological anguish. The plaintiff, who had enjoyed much success in her work at Dana-Farber that combined both clinical and research aspects, looked forward to a bright future in her field of breast cancer research. She eventually was forced to accept employment, at a hospital in another State, that involved clinical work only. By June, 1995, three months after the original article naming the plaintiff appeared in the Globe, a psychiatrist and fellow physician at Dana-Farber became concerned that the plaintiff might harm herself, wondered whether she was fit to work, and suggested that she see a psychiatrist. The plaintiff thereafter received weekly treatment, from August, 1995, until September, 1996, from Dr. Mary Ann Badaracco. Dr. Badaracco testified that the plaintiff suffered from an "adjustment disorder with depressive features" and was particularly troubled by Globe articles that the plaintiff perceived to be unfair. Dr. Badaracco's testimony was confirmed by several of the plaintiff's colleagues and a trained social worker, who found the plaintiff to be in a state of crisis or trauma. A colleague and friend observed that the plaintiff was

---

[36]We reject the Globe's assertion that the $300,000 award for lost compensation and injury to the plaintiff's business reputation ($240,000 assessed against the Globe and $60,000 against Knox) is unjustified because the plaintiff failed to show that these losses were caused by the Globe defendants. Apart from instructing the jury, generally, that compensatory damages must be calculated to compensate a plaintiff only for harm caused by the wrongful conduct, the judge also cautioned the jury to "attribute the damages to the people who caused them" so that "you are not holding one defendant liable for harm inflicted by another." There is no reason to believe that the jury did not understand the distinction between the two sets of defendants.

"very depressed" and "very anxious." Her sister testified that the plaintiff became a different person from the one she was before March 23, the day that the first article, naming the plaintiff, appeared in the Globe.[37] The plaintiff began to eat a lot, gained weight, and could not sleep. She cried frequently and would break down at family gatherings.

The above observations were independently confirmed at trial, through testimony of an expert forensic psychiatrist, Dr. Thomas G. Gutheil, who had extensively interviewed the plaintiff and examined her records. Dr. Gutheil testified to a series of events, including the Globe coverage and the publicity focused on her, that made the plaintiff feel personally singled out and blamed. Dr. Gutheil testified that these events had "serious mental effects" on the plaintiff, who suffered "severe" emotional distress and a "sense of devastation," and was in "mental pain or psychological pain and discomfort for most of [the] time." In Dr. Gutheil's opinion, a key injury to the plaintiff was "the impact to her reputation from being published in nationally available sources." He stated his view that the plaintiff suffered a "really devastating loss, really at the core of her identity." The judge found no basis on which to overturn the awards as excessive, and neither do we.[38]

5. The first paragraph of the amended judgment entered on October 15, 2003, is vacated. That paragraph is to be replaced with a further amended partial judgment finding the defendant Dana-Farber liable to the plaintiff on her claim for retaliation under G. L. c. 151B, finding the defendant Dana-Farber liable for attorney's fees in the sum of $391,340.80, with interest from September 23, 2002, and costs in the amount of

[37]The plaintiff's sister also testified that Knox paid an unannounced visit to the plaintiff's home at approximately 9 P.M. one evening. The sister, who was there alone at the time, testified that the plaintiff was "very upset and crying" when told of the incident.

[38]At trial, the plaintiff introduced evidence that the Globe's correction of Knox's inaccurate statement of March 23, 1995, that the plaintiff had countersigned the overdose orders, was not published until June 4, 1995. The judge properly instructed the jury, as requested by the Globe defendants, that they could consider the retraction of a libel statement as a factor in mitigating damages. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 860-861 (1975). There is no support for the Globe's assertion that the evidence may have impermissibly invited a punitive damages award.

$27,284.85,[39] finding the defendant Livingston not liable to the plaintiff, finding the Globe defendants liable to the plaintiff on all of her claims against them, and finding the Globe defendants liable for damages in the sum of $2,100,000, and costs in the amount of $8,959.84.[40] There is to be a new trial to assess the plaintiff's damages against Dana-Farber (without regard to the charitable cap set forth in G. L. c. 231, § 85K). The final two paragraphs of the amended judgment (neither of which are at issue in this appeal) are affirmed.

*So ordered.*

---

[39]In her brief, the plaintiff requests an award of additional attorney's fees and costs related to this appeal. She is entitled to such an award, based on the time and funds reasonably expended on the success of her G. L. c. 151B claim. Pursuant to the practice recently announced in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004), the plaintiff should file with the clerk of this court her application for fees and costs, together with any supporting materials, within fourteen days of the rescript from this court. Dana-Farber will have thirty days to respond to that submission. This court then will enter an appropriate order.

[40]Because we affirm the default judgments against the Globe defendants, we do not disturb the order, entered November 6, 2001, that they reimburse the plaintiff for attorney's fees, costs, and expenses incurred in connection with her efforts to secure their compliance with the discovery orders entered October 21, 1999, and June 13, 2000, in the amount of $27,781.70. See note 32, *supra.*